651 P.2d 512

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Guy Robert AGUILAR,
Defendant-Appellant.**

No. 13171.

Supreme Court of Idaho.

Sept. 10, 1982.

Jess B. Hawley, III, Boise, for defendant-appellant.

David H. Leroy, Atty. Gen., Lynn E. Thomas, Sol. Gen., Timothy M. Walton, Deputy Atty. Gen., Boise, for plaintiff-respondent.

BAKES, Chief Justice.

The appellant Aguilar appeals his conviction for the crime of perjury. On June 28, 1978, Guy Robert Aguilar appeared before a Third District Court magistrate in two cases. One case was a civil contempt hearing in the case of *Margaret Jo Aguilar v. Guy Aguilar,* Case No. L–25615. The other was a reciprocal action, *State of Oregon v. Guy Aguilar,* Case No. L–25615RI. At that time, the child support administrator for the prosecuting attorney's office informed the magistrate that an order consolidating the contempt and reciprocal actions had been prepared, but had not yet been filed and received by the court. Nevertheless, the court decided to treat the two cases as being consolidated.

The magistrate first proceeded with the civil contempt case. The appellant was placed under oath. He testified and was found to be in contempt of court and was sentenced to thirty days in jail. The magistrate then turned to the reciprocal action.

Apparently, the defendant had not been served with a summons and complaint for the reciprocal action and was unfamiliar with it. A short recess was held so that the appellant might familiarize himself with the contents of the complaint. Court was then reconvened, and Aguilar was called to the stand; however, no oath was given.

During Aguilar's examination, he was asked, "How much money do you have on you today? On your person?" Aguilar answered, "Thirty cents." After the hearing, Aguilar was taken to the Canyon County jail, and his personal property inventoried. Aguilar was found to have $85 in his wallet. Thereafter, the state filed an information charging Aguilar with perjury, a violation of I.C. § 18–5401. An amended information setting out the material facts with more specificity was later filed. During the trial, the tape recording of the magistrate's hearing was admitted into the record, but was not played to the jury. The magistrate who heard the two prior cases and a deputy court clerk testified concerning the events that occurred during the hearing of those two cases. A transcript from the recorded proceedings was admitted into evidence, but it contained only the alleged perjurous statement and none of the other testimony or proceedings from the prior two cases.

During the course of the trial there was a question of whether the two prior proceedings were properly consolidated, and whether the magistrate court had jurisdiction over Aguilar in the reciprocal action because no complaint in the matter had been served. Also, a question arose whether Aguilar had been under oath during his testimony in the reciprocal proceeding. The district judge listened to parts of the tape recording of the prior proceedings which were admitted into evidence and concluded as a matter of law that the two cases had been consolidated and that the oath which had been given at the beginning of the contempt proceeding was also effective in the reciprocal proceeding. The judge also ruled that the defendant had consented to the magistrate court's jurisdiction in the reciprocal proceeding, because he did not object or ask for a continuance.

In instructing the jury, the judge gave the following instruction:

"[T]he court has determined, as a matter of law, that the accused did take an oath that he would testify truthfully before a competent tribunal in a hearing in which such an oath may be administered and that this hearing involved two different cases that were being considered together."

After deliberation, the jury returned a verdict of guilty against the appellant.

The appellant raises only two issues on appeal. First, he argues that the trial court erred in admitting parol testimony, particularly that of the court clerk and the magistrate, as proof of the judicial record contained in the tape recordings of the prior proceedings. It is clear, however, that the appellant did not object to the admission of the parol evidence at trial. In fact, much of the testimony of the magistrate and the clerk came in through cross examination by appellant's counsel. It is well established that this Court will not review the admissibility of evidence objected to for the first time on appeal or elicited by the objecting party. *E.g., State v. Hatton,* 95 Idaho 856, 866, 522 P.2d 64, 74 (1974). Therefore, we do not address that issue.

The second issue raised by appellant is that the trial court's finding and instruction that, as a matter of law, the defendant was under oath in the reciprocal action was error. Appellant bases this assertion upon the claim that the court had no jurisdiction over him for purposes of the reciprocal action at the time when the oath was initially administered to him in the civil contempt proceeding. It is therefore argued that the oath given in the contempt proceeding was not effective for purposes of the reciprocal action.

The appellant does not expressly state whether his concern is with a lack of subject matter or personal jurisdiction. However, it is clear that the attorney magistrate involved had subject matter jurisdiction over the reciprocal action. I.R.C.P. 82(c)(2)(C). As for personal jurisdiction, we

agree with the trial court that the appellant must be deemed to have consented to the court's jurisdiction over him, because he did not object or raise as an affirmative defense the asserted lack of personal jurisdiction over him as required under I.R.C.P. 12(b) and 12(h), and participated in the proceeding.

■ The question thus remaining is whether the oath was effectively carried over to the reciprocal action, where the oath was administered prior to the commencement of the contempt proceeding. At the beginning of the contempt proceeding the magistrate made it clear that he was taking up both cases together.[1] There is no question but that the oath was properly administered in the contempt proceeding and that the court had jurisdiction, both subject matter and personal, in that proceeding. By consenting to the court's jurisdiction over him in the reciprocal action, the appellant also acknowledged and consented to the magistrate's consolidation of the two proceedings. By so consenting to the court's jurisdiction over him in the reciprocal proceeding, and the consolidation of that action with the contempt proceeding, he continued to be answerable for the oath that he gave during the contempt proceeding. The judgment of conviction is therefore affirmed.

DONALDSON and SHEPARD, JJ., concur.

McFADDEN, Justice, dissenting. .

I must dissent from the opinion of the majority because the trial court improperly directed the jury that as a matter of law Aguilar was under oath at the time of the alleged false statement. The elements of perjury as defined in I.C. § 18–5401 are (1) that defendant has taken an oath, (2) before a competent tribunal, officer or person, and (3) that he wilfully made a false statement (4) as to a material matter.

The state must allege and prove to the jury each essential element of the crime charged. See, e.g. *State v. Dunn,* 44 Idaho 636, 258 P. 553 (1927); *State v. Scheminisky,* 31 Idaho 504, 174 P. 611 (1918); *Brooks v. U. S.,* 240 F.2d 905 (5th Cir. 1957).

It is plain that an essential element of the crime of perjury is that the accused shall have taken an oath before giving the alleged false testimony. Proof of the charge requires that sufficient evidence be adduced before the jury upon which it can be found beyond a reasonable doubt that an oath was administered to the defendant by some officer authorized to do so. *Smith v. U. S.,* 363 F.2d 143 (5th Cir. 1966); *Harrell v. U. S.,* 220 F.2d 516 (5th Cir. 1955). No fact can be taken away from the jury in a criminal case. *U. S. v. Sheldon,* 544 F.2d 213 (5th Cir. 1976); *Roe v. U. S.,* 287 F.2d 435 (5th Cir. 1961).

Whether Aguilar was under oath at the time of the alleged false testimony was a question of fact for the jury and the court's determination that he was under oath as a matter of law was plain error. *See generally Goins v. Commonwealth,* 250 Ky. 636, 63 S.W.2d 794 (1933); *State v. Mann,* 219 N.C. 212, 13 S.E.2d 247 (1941); *Brooks v. U. S., supra; Smith v. U. S., supra.*

I would reverse the judgment of the trial court and remand the case for a new trial.

BISTLINE, J., concurs herein.

McFADDEN, J., submitted his opinion in this matter prior to his retirement on August 31, 1982.

BISTLINE, Justice, dissenting.

Justice McFadden's opinion is well-written, founded on sound principles of law and should have convinced the other members of the Court in the error of their ways. I

---

1. In the perjury trial, the trial court ruled, following its review of the tape recorded proceedings in the contempt and reciprocal actions, that those two actions had been consolidated by the magistrate. In so doing, the court was merely taking judicial notice of the court records from the prior proceedings. Based upon such judicial notice, it was within the province of the court to instruct the jury that, as a matter of law, the defendant was under oath during his testimony at the reciprocal proceeding. *E.g., State v. Kellogg,* 102 Idaho 628, 636 P.2d 750 (1981).

join his opinion. Ordinarily, that would be the extent of my own participation in this case. However, when it initially befell my lot to draw this case, I necessarily became fully conversant with it and wrote a reversing opinion which failed to command a majority of the Court. Although I have never completely understood how the existing principles of law and the facts of this case could produce anything but an acquittal, I am mindful that although, in my opinion, the learned trial judge fell into error, he somewhat rectified the matter by the leniency of the sentence imposed. I am more than mindful that most prosecuting attorneys would not have prosecuted Aguilar on a perjury charge arising out of such confusion, and once again observe the awesome power given prosecutors with which they can wield or yield in their "prosecutorial discretion." In this instance, I think abstention would have been the better exercise of discretion. Nothing in the record suggests that the unrepresented Aguilar was a habitual criminal, *see State v. Couch,* 103 Idaho 205, 646 P.2d 447 (1982) (Bistline, J., dissenting), whose conduct pointed toward willful perjury and required that he be so branded and subjected to the State's retribution. The courts should be reserved for the prosecution of defendants more deserving of the state's time and effort. As an example of the result of the current demands being made upon the judicial process, a recent news article related the dismissal of a shoplifting charge because of a prosecutor's lack of resources—primarily time. Considering the combination of dwindling judicial resources with the dwindling resources available to prosecutors, it does not seem that this case required the diligent attention it has received.

Entertaining these views, as I do, and believing that the judgment of conviction entered against Aguilar is unfair and untenable, I feel compelled to disclose more of the record in the hope that today's majority opinion will henceforth have the precedential value to which it is entitled. As one legal mind in a community numbering almost 2,000, I am bewildered by the underlying theme of the majority's declaration that the trial court could hear evidence—evidence not even submitted to the jury—and rule "as a matter of law that the two cases had been consolidated and that the oath which had been given at the beginning of the contempt proceeding also was effective in the reciprocal proceeding." With concern I note that the trial court's instruction is actually no instruction at all, but simply advice by the trial court as to the fact that the court had removed that issue from the jury's consideration—in effect a *directed verdict* on one important element of the State's case. I am equally concerned that the Court moves from that posture to another entirely distinct position, that parol evidence (said to have been admitted without objection) was the proof of the prior judicial record at Aguilar's trial. This, to my mind, serves only to demonstrate the majority's unfamiliarity with the appeal record—in which regard I not only stand bewildered but worried as well.

When the Court finally purports to explain how Aguilar—summoned into court on the contempt proceeding—became subject to the court's jurisdiction in a case in which he had not even been served with process, I am beyond any feeling; I am dumbfounded. The Supreme Court of Idaho, as it often declares, administers and supervises the entire statewide judicial system. Today, by a majority of one vote, it sanctions what has to be recognized as outright oppression imposed upon a citizen of this state—a young man totally unknowledgeable in the ways of the legalistic bureaucracy. With probably 1,600 of Idaho's 1,800 attorneys belabored and dismayed by the proliferation of rules and constant amendments thereto (more than to which they can scarce attend and yet engage in the practice of law) this honorable Court now rules that the young, ignorant, and embroiled Aguilar *must be* deemed to have consented to the Court's jurisdiction in the reciprocal action because he failed to plead the affirmative defenses in the manner required by Rules 12(b) and 12(h). Furthermore, the Court decides that as a result of his presence in the court room and being in

the custody of the jailer, Aguilar participated in the proceeding. *O tempora, O mores.* Oh Aguilar, better, young man, to have schooled yourself in the Rules of the Court.

## I.

Aguilar was found guilty of the crime of perjury, awarded a withheld judgment and placed on a five year probation, which term has not yet expired, and which required that he serve six months of incarceration with a grant of workout privileges. He appeals to challenge the proceedings which led to the jury verdict. *See Baker v. Burlington Northern, Inc.,* 99 Idaho 688, 587 P.2d 829 (1978); *see also State v. Wagenius,* 99 Idaho 273, 581 P.2d 319 (1978).

By complaint, and then by information following a preliminary hearing, he was charged as follows:

"That Guy Robert Aguilar on or about the 28th day of June, 1978, in the County of Canyon and State of Idaho, then and there being, did then and there wilfully, knowingly, intentionally, unlawfully, feloniously and falsely after having taken an oath to testify, declare, depose and certify truly, administered by the Honorable A. Marvin Cherin, of the Third Judicial District of the State of Idaho, in and for the County of Canyon, a competent *officer who by law may administer oaths,* did testify at a hearing, to wit: MARGARET JO AGUILAR VS. GUY ROBERT AGUILAR, Case No. L–25615, and that wilfully and contrary to such oath, said Defendant stated and declared said testimony to be true, when in fact, said testimony was not true and wilfully and contrary to the said Defendant's oath, misstated said testimony which was a material matter to the aforesaid cause."

Prior to trial the prosecutor, with Aguilar's court appointed counsel consenting stipulation, filed an amended information setting out the material facts with more specificity:

"That Guy Robert Aguilar on or about the 28th day of June, 1978, in the County of Canyon and State of Idaho, then and there being, did then and there wilfully, knowingly, intentionally, unlawfully, feloniously and falsely after having taken an oath to testify, declare, depose and certify truly, administered by SHIRLEY MARANG, Deputy Clerk of Court of the Third Judicial District of the State of Idaho, in and for the County of Canyon, a competent officer who by law may administer oaths, did testify at a hearing, to wit: MARGARET JO AGUILAR vs. GUY ROBERT AGUILAR, Case No. L–25615, and that wilfully and contrary to such oath, said Defendant stated and declared to be true testimony that he said Defendant had, 'Thirty cents' (30¢) on his person, when in fact, said testimony was not true and said Defendant wilfully and contrary to said Defendant's oath, testified falsely about said matter which was a material matter to the aforesaid case."

The case came on for trial five months later on Monday, the 6th day of November. A jury was impanelled and sworn. The State's first witness, Shirley Marang, identified herself as a deputy clerk who had worked in and for the magistrate court on the 28th day of June, 1978, which was the day on which the State contended that Aguilar testified falsely. Deputy clerk Marang remembered Aguilar, but she remembered and so testified that he was a party in *two* cases, volunteering that one was a reciprocal action initiated by the State of Oregon, and the other a contempt for child support. She remembered that she administered to Aguilar the usual testimonial oath taken by witnesses, which she recited, but this was thereafter stricken from the jury's consideration on objection by Aguilar's attorney. The objection was premised on the basis that the electronically recorded tape of the proceeding was better evidence than the recollection of the witness.[1]

1. I.C. § 1–2212 provides:
   "Record of proceedings—Request for stenographic reporting—Costs.—A verbatim record of the proceedings and evidence at trials before a magistrate shall be maintained either by electrical devices or by stenographic

The State then produced and had marked as Exhibit 1 a transcript of the tape which Marang testified to having prepared. Objection again was made that the tape itself was the best evidence. The prosecutor contended that I.C. § 9–411, "the best evidence rule, gives consideration and exception to transcripts for recorded hearings."[2]

Aguilar's attorney was allowed voir dire questioning of the witness, which brought forth the testimony that there had been in fact "two definite, two separate" cases on file in that court, both of which named Aguilar as defendant. As will be developed, Aguilar had no knowledge of one, having not been served with process, and was present in court pursuant only to the dictates of an order to show cause which had been served upon him in case No. L–25615, a post-judgment contempt proceeding being prosecuted by his former wife. (The prosecutor had asked the witness, Marang, only if she "remember[ed] a case involving *one* Guy Aguilar." As it turned out there was only one Guy Aguilar, but there were, indeed, two cases. The prosecutor in his questioning avoided mentioning, or at least did not identify by number, the "a case" to which he referred. L–25615, of course, was the case, and the only case, in which Aguilar stood accused of giving perjurious testimony.) Defense counsel elicited from the witness that Exhibit 1 was the transcript of the tape recording of the reciprocal action against Aguilar, wherein the State of Oregon was the named plaintiff. The testimony was extremely germane be-

cause Aguilar was at that time charged with perjury only in connection with civil case No. L–25615, Margaret Jo Aguilar v. Guy Aguilar. He was not charged with perjury in the separate reciprocal action, captioned State of Oregon v. Guy Aguilar, given the separate number L–25615 RI. Defense counsel made it explicitly clear through the witness that Aguilar had only been sworn one time, although there were two cases:

"MR. ROSENBERRY: So, there were two definite cases. Is that correct?

A Yes, there were two separate cases.

MR. ROSENBERRY: There was a contempt proceeding on a divorce action which is a separate file and then there was a reciprocal from Oregon which was a different file?

A Yes.

MR. ROSENBERRY: Now, did you specifically administer an oath to the defendant on the Oregon case?

A Not specifically, no. He was still under oath from the proceeding.

MR. ROSENBERRY: Well, just a minute. I would object and ask that be stricken, Your Honor, as not responsive.

THE COURT: Sustain the last portion of the objection and her answer will be stricken.

MR. ROSENBERRY: You did not administer an oath in the Oregon proceeding.

A No."

means, as the magistrate may direct, but if any party to the action requests stenographic reporting of the proceedings, the reporting shall be done stenographically. The requesting party shall pay the costs of reporting the proceedings."

2. I.C. § 9-411 seems inapplicable; the prosecuting attorney more likely had in mind I.R.C.P. 83(d), which provides:

"Record of proceeding of magistrates division.—The court in the magistrate's division shall make a verbatim record or recording of all proceedings held before a magistrate except a hearing in the small claims department."

Rule 83(d), it is to be noted, is but one part of Rule 83, the component parts of which run from (a) through (y). There is no procedure established for preparing and settling transcripts other than on an appeal, as provided by Rule 83(j), (k), (*l*), and (*o*). Therefore, in a magistrate trial or hearing where there is not stenographic reporting, it would seem to follow that the electronic recording (tape) is the best evidence of that which transpired, especially where such is placed in issue in an entirely collateral action. Obviously the transcription of that tape, while it *might* be as accurate as the tape itself, certainly cannot be any better, and brings into play the possibility of error in hearing and error in typing.

The transcript, Exhibit 1, was at that time not admitted.[3] The prosecutor failed in a further attempt to introduce, through the witness Marang, testimony allegedly given by Aguilar in the civil contempt hearing, and then withdrew the witness.

A second witness, Marilyn Slabaugh, was called and sworn (as revealed by the reporter's transcript). She established her position as a deputy clerk whose duties included custody of the court records. She produced the court file, including the tape, in Civil case No. L–25615—which was marked as Exhibit 2. Defense counsel was again allowed to voir dire the witness in aid of a possible objection, and established by this witness, too, that case No. L–25615 was different from case No. L–25615 RI—that they were "separate proceedings."

She testified to having then recently heard the tape, Exhibit 2, and that it confirmed that there were "two distinct separate proceedings." At this point the jury

---

**3.** The trial court had sustained an objection to the introduction of Exhibit 1, the transcript, the best evidence rule, as above noted. The witness had established that the transcript, a *partial one page affair, which verbatim is:*

"CALDWELL, IDAHO, WEDNESDAY, JUNE 28, 1978

"BE IT REMEMBERED, that on this, the 28th day of June, 1978, the above entitled cause came on duly and regularly for hearing on the plaintiff's Order to Show Cause at Caldwell, Canyon County, Idaho, before the Honorable A. Marvin Cherin, Magistrate, and the following proceedings were had, to wit:

"The defendant was called, sworn, examined, examined by the Court.

"COURT: Anything else you wish to say, Mr. Walker?

"MR. WALKER: I just have one question of the defendant: How much money do you have on you today? On your person.

"DEFENDANT: Thirty cents.

"MR. WALKER: Thirty cents? How did you plan to get back to Coeur d'Alene on thirty cents?

"DEFENDANT: Well, see, I was supposed to have a check today from my job up North and I was going to borrow some money from a friend of mine for my gas expenses to drive back and then mail him the money when I cashed my check."

*was excerpted from the Oregon reciprocal action—concerning which case Aguilar did not then stand charged.*

In what has to be considered a most unusual court proceeding, the witness after agreeing that there were two separate cases found in two separate files, admitted that no oath was administered on the Oregon case, but volunteered her conclusion that Aguilar "was still under oath from the [prior] proceeding,"— which remark was stricken thereafter on objection as aforesaid. It is difficult to understand how the court could countenance the State's conduct in offering into evidence an exhibit which clearly read that Aguilar had been administered an oath in the Oregon reciprocal proceeding, when such had not been given, and when the certificate attached to the one page transcript was not true, and was only the con-

clusion of the deputy clerk who prepared it and was on the stand. *Other than for defense counsel's astuteness a fraud would have been perpetrated upon the court and upon the defendant.*

When the partial transcript was later offered after a State's witness orally testified to Aguilar's testimony in the Oregon reciprocal action, (set forth in the transcript), defense counsel again asked that the court note his objection to lines 8–9 which recited the giving of an oath, and otherwise did not object, as Aguilar would later give similar testimony in that regard. Defense counsel did remark that the court had "already ruled upon" the oath—that Aguilar's one oath in the divorce action applied to both hearings. The court reserved its rulings on those two lines of the transcript—which was again taken up at the conclusion of the State's case:

"MR. ROSENBERRY: Well, Your Honor, my main objection to that is to the document itself, is now going to be submitted to the Jury and they will be able to read it and it *looks like that just occurred . . . the moment the oath was given and then they gave the testimony.* I think we have it corrected by the testimony of Mrs. Marang that there was a considerable lapse of time. In fact, one proceeding had been concluded and disposed of in the intervening time, but the document itself, the exhibit we are now talking about in this case, has all the indications that it was followed just naturally in the course of events that it happened and then the first question was that Mr. Walker says this question and then the answer. And that is the only thing.

"MR. JONES: I think the Court has ruled there was an oath given and I don't see any problem with it.

"THE COURT: The position of the Court on that particular transcript is *somewhat misleading* and the Court does intend to instruct the oath was given, but I am going to block that matter out." (Emphasis added.) Lines 8 and 9 were blocked over by the court, but unfortunately, were still clearly readable by the jury, as witnessed by the fact that the same are still readable at this much later time.

was excused for a recess during which defense counsel wanted to hear the tape, Exhibit 2.

With the jury retired, the prosecutor moved for a continuance until Thursday morning, making no showing which appears of record. The motion was granted notwithstanding, and notwithstanding defense counsel's statement that defendant was down from Northern Idaho, witnesses were under subpoena, and counsel was then prepared to move for acquittal and have it disposed of.

When court convened on Thursday morning, the following proceedings took place:

"THE COURT: Criminal action 4260, State of Idaho versus Robert Aguilar. You recall the Court continued this matter from Monday so that Counsel and the Court would all have an opportunity to look at a legal argument that had been presented to the Court and that concerned whether or not the oath that had been given to the defendant in the civil case of Margaret Jo Aguilar versus Guy Robert Aguilar carried on into the second case that involved a reciprocal action against Mr. Aguilar. Of course, you recall we all attempted to find something on that in the law library before excusing the Jury but were unable to actually find anything that would satisfy the Court, so I did continue it.

. . . .

"The Court has not found anything that specific or identical to our factual situation either, but I have reviewed the cases that have been cited by the State as well as our own research, and then I went back and I listened to the tape in parts a couple of times and I had my law clerk listen to it along with the Clerk and they took certain notes for the Court and while at first I felt that the oath may not be adequate I felt after reviewing the matter several times that the oath that was given in this case would carry forward throughout the proceedings for these reasons.

"As I understand it you primarily look to the heart and conscience of the witness to see whether or not that person would likely believe that he was under an obligation to tell the truth. That is whether or not in good conscience he would be in a position to feel that he was under an obligation to tell the truth throughout the proceeding.

"Now, I was getting kind of hung up on whether or not we were talking about two cases or whether we were talking about one proceeding that involved two cases.

"I think if you go back and listen to the tape you will find that everybody was considering the two cases as one hearing and in fact in reviewing the statements that were made just prior to the taking up of that case the judge came into court and he called the case of Margaret Aguilar and Guy Aguilar and then he said, 'Which one are we here on, I have two files. Are we here on the reciprocal.' At that time John Rogge advised the Court that there had been an order consolidating the contempt and reciprocal actions but it may not have been filed and gotten through the Court yet. It does show that there has been an order consolidating the cases filed one day subsequent to this hearing, but that would indicate there had been put in motion the desire to treat these cases as consolidated.

"Then, the Court said, 'This is for both matters, right?' Then, John Rogge replied that it was for both. Then the Court went ahead and explained both matters to the defendant, explained to him that he was in here on an order to show cause where he could be held in contempt and possibility of punishment up to thirty days in that case and also explained to him that there was a reciprocal action and the nature of the reciprocal action. Then, the Court took up the contempt matter by saying . . . by using this language. He said, 'Let us proceed on that one first then come back to the other one.' So, he wasn't dismissing or continuing or putting over to another time the one case. He was just . . . he said we will proceed with this one first

and come back to the other one. *Then, he was at that time sworn under a proper oath given by proper officer to administer that oath.*" (Emphasis added.)

It is to be kept in mind that Exhibit 2, the tape which the court refers to in the above passage, had never been offered or admitted in evidence.

Following the court's ruling that Aguilar was under oath when he testified in the reciprocal action, and therein said that he had 30 cents on his person, the court took up the matter of a Second Amended Information which was apparently in hand and which the State desired to file. The Second Amended Information charged:

"That Guy Robert Aguilar on or about the 28th day of June, 1978, in the County of Canyon and State of Idaho, then and there being, did then and there wilfully, knowingly, intentionally, unlawfully, feloniously and falsely after having taken an oath to testify, declare, depose and certify truly, administered by SHIRLEY MARANG, Deputy Clerk of Court of the Third Judicial District of the State of Idaho, in and for the County of Canyon, a competent officer who by law may administer oaths, did testify at a hearing, to wit: MARGARET JO AGUILAR vs. GUY ROBERT AGUILAR, Case No. L–25615, and STATE OF OREGON vs. GUY ROBERT AGUILAR, Case No. L–25615 RI, and that wilfully and contrary to such oath, said Defendant stated and declared to be true testimony that he, the said Defendant, had 'Thirty cents' (30¢) on his person, when in fact, said testimony was not true and said Defendant wilfully and contrary to said Defendant's oath, testified falsely about said matter which was a material matter to the aforesaid case."

The filing of this amended charge was allowed over defense counsel's objection:

"[T]hat by enlarging this to cover the proceeding of State of Oregon versus Guy Robert Aguilar you are going to charge a different offense and certainly be substantially prejudiced to this defendant. Under those conditions we would oppose the filing of the information.

"I might advise the Court the fact not only on the other but also on the State of Oregon versus Guy Robert Aguilar we relied, of course, based upon the Clerk's transcript that was prepared and submitted in the preliminary hearing that these things were done."

The trial court in announcing its ruling again confirmed its

"prior ruling, we are talking about one hearing that involves two cases and an oath was administered at that hearing, and my ruling is to the effect that the oath in that hearing satisfied the proceedings of both cases."

The court at the same time noted possible prejudice to the defendant by reason of the structure of the Second Amended Information:

"The concern I might have here is the way which the State has incorporated this. It may suggest to a Jury that he may have committed perjury in two different cases. In other words, that they may take the position by the mere charge that since this apparently, from the State's point of view, could have occurred in two different cases. Of course, they are advised the Information is not in evidence but ..."

Having heard the trial court rule unequivocally that Aguilar was under oath when he testified that he had on his person 30 cents, thus removing that factual issue from the jury's consideration, and having received the court's ruling which allowed in mid-trial the filing of a second amended information, defense counsel suggested that the defense would like a ruling on materiality. The court declined to do so, and the trial proceeded so that, as the court expressed it, there would be an "opportunity to know exactly how it (materiality) does fit into the case and what was in fact said and under what circumstances it was said."

The jury was returned to the box, and Judge A. Marvin Cherin was sworn as a witness. Asked to testify if he recalled any question addressed to Aguilar invoking cash on his person, he answered that "Mr. Walk-

er asked Mr. Aguilar, I believe, how much cash on his person he had," and that the answer was "I don't recall exactly, I believe he said he had either thirty or thirty-five some cents onto a dollar."

Having had the benefit of the trial court's prior ruling, the prosecutor asked Judge Cherin only whether he recalled "if Mr. Aguilar was given an oath on the 28th." He answered in the affirmative.

Defense counsel on cross-examination brought out Judge Cherin's awareness of two separate cases, and asked "whether the oath was administered in both cases or just in one case." At this point the prosecuting attorney objected, quite correctly relying on the court's prior ruling. Strangely, the court allowed the question, and Judge Cherin answered in line with the court's ruling that "[t]he cases were treated as one." Defense counsel sought a more explicit answer:

"Q. Do you recall whether or not an oath was administered in both cases or in just one case?
A. There was one oath administered for both cases.
Q. Was that administered in the case at the time you took up the case on the contempt charge?
A. My recollection is that Mr. Aguilar was called as a first witness by the Prosecuting Attorney, so it was administered before any testimony was given.
Q. That was in the contempt charge in that case?
A. As far as I recall they were heard together. I don't think we called one case and did that one and started another one. My recollection is that they were treated as one case.
Q. But, there was not two separate oaths, then?
A. That is correct, there were not two separate oaths."

On redirect examination the prosecutor asked Judge Cherin: "Did you consider Mr. Aguilar to be under oath during the whole proceeding?" The court did not allow the question, now retrenching to the ruling handed down before Judge Cherin took the stand: "THE COURT: Well, I am going to take the position that it is a legal question for the Court and I have ruled on that."

Mr. Keith Walker from the prosecutor's office testified to remembering the question which he put to Aguilar: "[S]o I asked him how much money he had on his person," and "he said he had thirty cents." Mr. Walker on cross-examination was asked if he recalled that there had been two cases, the contempt charge arising in the post-divorce action and the Oregon reciprocal action, and stated that he did, going on to volunteer, "*I cannot remember whether they were consolidated or not.*" (Emphasis added.) He remembered an oath given "at the initial proceeding," just after testifying:

"I know the oath was given and, like I say, I cannot remember the two cases were consolidated, whether they were treated as one or not."

Finally, after establishing that Aguilar had $85.00 on his person when jailed on the contempt charge, the prosecutor returned the first witness Shirley Marang to the stand, and consonant with the trial court's ruling, simply asked her if she had on the 28th day of June given an oath to Mr. Aguilar. She truthfully said that she had. Consistent with her earlier testimony she agreed that the oath was given in the first of two cases, the contempt charge for failure to pay child support, and that no oath was administered in the second matter, the reciprocal case from Oregon.

The State rested; the defense moved for an acquittal challenging the materiality of the perjury charged in the State's amended information. In denying the motion the court again repeated the prior ruling exactly as the prosecutor earlier believed himself to have heard it:

"THE COURT: I think the ruling of the Court made prior to testimony is even stronger now than it was previously . . . . The Court has already ruled that we are talking about one hearing in which two matters, two cases were taken up."

After the evidence was in and both sides rested, at the conclusion of the instructions

conference, the court's ruling on the administering of the oath was mentioned again by the prosecutor, who apparently wanted to remind defense counsel for the last time that the prosecution had the court's ruling that Aguilar was under oath in both cases, and that issue was foreclosed from jury consideration and counsel's argument:

"MR. JONES: On the matter of us being precluded from going into that on argument, they will be instructed as a matter of law that the oath was duly administered?

THE COURT: That is correct."

The State concluded its presentation without offering Exhibit 2 (the tape) in evidence, notwithstanding that it was the entire basis of the court's ruling that Aguilar was under oath when he testified as to cash on hand in the Oregon reciprocal action. Defense counsel did not ask that it be admitted, but did request that it be made a part of the record. In fact, defense counsel was specific that he did not seek its admission as evidence before the jury, which it was not, but he opined that the court had used it to make his rulings and for that reason it should remain as part of the court record. The prosecutor in voicing no objection mused that relevant portions should be played to the jury, although he had by then rested the State's case, and he did not further pursue the matter other than to lament, incorrectly, that he had "several times tried to admit the tape and it was objected to by the defendant."[4]

The court's ruling was that the tape would be "admitted"—not in evidence, "but to complete the record so that the entire

matter will be before the appellate court in the legal issues that the Court has ruled on so it is presented to them."

At the same time that the tape was made a part of the record, there was discussion concerning defense counsel's objection to the introduction of the partial transcript, Exhibit 1. Here again the prosecutor insisted, "I think the court has ruled there was an oath given and I don't see any problem with it." To this the court responded again that "the Court does intend to instruct the oath was given . . . ."

It is altogether beyond cavil that the trial court, based upon its hearing of the unoffered and unadmitted tapes, ruled steadfastly that Aguilar was in fact under oath when asked about the money on his person. It is not readily understood why the court, having so ruled, did not then orally advise the jury that he had removed from their consideration that important factual issue in a perjury trial, the doing of which would have earlier on informed the jury that their only concern would be what Aguilar did say, whether it was false, and whether it was material.

However, putting surmise aside, the court did that which it had stated it would do; it so advised the jury of its ruling at the time of instructing the jury. That part of Instruction No. 11[5] which informed the jury that the court had determined as a matter of law, that Aguilar was under oath was not at all an instruction on applicable law governing perjury cases, but was simply nothing more than a statement of the court's oft-repeated ruling made during the

4. The Reporter's Transcript does not reflect any offer of the tape into evidence. In fact, as pointed out earlier, defense counsel had insisted that the tape was the best evidence. Yet, it was not offered, and it was not admitted.

5. "INSTRUCTION NO. 11

"Every person who, having taken an oath that he will testify, declare, depose, or certify truly, before any competent tribunal, officer, or person in any of the cases in which such an oath may by law be administered, wilfully and contrary to such oath states as true any material matter which he knows to be false, is guilty of perjury.

"You are instructed that the Court has determined, as a matter of law, that the accused did take an oath that he would testify truthfully before a competent tribunal in a hearing in which such an oath may be administered and that this hearing involved two different cases that were being considered together.

"It is up to you to decide whether the accused, after taking such oath, did wilfully and contrary to his oath state as true any material matter which he knew to be false."

course of the trial. Defense counsel having unsuccessfully resisted that ruling was nevertheless bound by it, and nothing in the rules required him to take an exception (as is sometimes so in other jurisdictions). As the older practitioners will recollect, any interlocutory order, ruling, or decision appearing upon the record is deemed excepted to, and reviewable upon appeal from any final judgment.

## II.

The State's primary contention in defending against Aguilar's appeal is that "[a]ssuming, *arguendo,* that it was error for the trial court to allow the court officials to testify about what occurred during a prior judicial hearing, any error committed by the court was waived by the appellant [Aguilar]." This contention, however, is not supported by the record, which has been reviewed with great pains, and much of which is hereinabove recapitulated. Defense counsel objected immediately when the State sought to establish through the witness Marang the administering of an oath in the Oregon reciprocal action, and only ceased objecting to the State's efforts when the trial court allowed the two day continuance during which it and its attaches listened to the unadmitted tape and *ruled* as a matter of law that Aguilar was under oath when he testified in that action—following which the court allowed the filing of a mid-trial Second Amended Information. From the time that the court ruled as it did, defense counsel was precluded from attempting to convince the jury that an integral element of the crime of perjury was missing.

As mentioned above, surmise as to why the court indulged in such a procedure is likely a futile exercise, but it is logical to believe that reviewing the tape as it did was induced by that very procedure which is utilized where a district court sits as an appellate court in review of magistrate proceedings. However that may be, it cannot be said that Aguilar waived the error (and such it was) of the trial court in ruling as a matter of law that Aguilar was adminis-

tered an oath, thereby removing from the province of the jury the determination of a factual issue.

## III.

The question presented by Aguilar's first contention is not whether as a matter of fact Aguilar was or was not under oath, but rather whether the question of being placed under oath is a question of law for the court or a question of fact for the jury.

I.C. § 18–5401 defines perjury:

"Every person who, having taken an oath that he will testify, declare, depose, or certify truly, before any competent tribunal, officer, or person in any of the cases in which such an oath may by law be administered, wilfully and contrary to such oath, states as true any material matter which he knows to be false, is guilty of perjury."

The essential elements of perjury as defined in this statute are (1) that defendant has taken an oath (2) before a competent tribunal, officer or person, and (3) that he wilfully makes a false statement (4) as to a material matter. *See generally United States v. Debrow,* 346 U.S. 374, 74 S.Ct. 113, 98 L.Ed. 92 (1953); 70 C.J.S. Perjury § 24 (1951).

The right to trial by jury in Idaho is inviolate. Id. Const. Art. I, § 7. The state must allege and prove *to the jury* each essential element of the crime charged. *See, e.g., State v. Dunn,* 44 Idaho 636, 258 P. 553 (1927); *State v. Scheminisky,* 31 Idaho 504, 174 P. 611 (1918); *State v. Adams,* 22 Idaho 485, 126 P. 401 (1912). In *Dunn,* the Court held that a previous conviction was an essential element of a persistent violator charge and that it was error to find as a matter of law from a court record that defendant did have a prior conviction. Whether Aguilar was under oath is strenuously disputed. Proof that he was is an essential element of the crime of perjury. Although normally proving that a defendant was under oath is a mere formality, that does not remove from the state the burden of proving this element. *See State v. Filson,* 101 Idaho 381, 613 P.2d 938 (1980)

(must prove where crime occurred for venue purposes); *State v. Needs,* 99 Idaho 883, 591 P.2d 130 (1979) (must prove where crime occurred for venue purposes). Just as a defendant's prior conviction is a jury question even in the face of a court record, so determining whether a defendant was under oath is a factual issue for the jury in a perjury prosecution.

The statement by the Supreme Court of Washington in *State v. Dale,* 110 Wash. 181, 188 P. 473 (1920), is appropriate here:

" 'Appellant further contends the trial court erred in directing the jury to return a verdict of guilty. This contention must be sustained. Section 22, art. 1, of the state Constitution guarantees to the accused in a criminal prosecution the right to speedy trial by an impartial jury. Section 2309, Rem. & Bal. Code, provides that: "No person informed against or indicted for a crime shall be convicted thereof, unless by admitting the truth of the charge in his plea, by confession in open court, or by the verdict of a jury, accepted and recorded by the court." '

" 'If the trial judge may be permitted to direct a verdict of guilty in a criminal prosecution, the conviction is his act, and not the verdict of a jury. In *Sparf & Hansen v. United States,* 156 U.S. 51, 105 [15 Sup.Ct. 273 [294] 39 L.Ed. 343], the court said: ... "[I]t is not competent for the court, in a criminal case, to instruct the jury peremptorily to find the accused guilty of the offense charged or of any criminal offense less than that charged." '

"If a trial court cannot decide as a matter of law or fact upon a jury trial under any circumstances that a defendant is guilty, that is, that all of the elements of the crime charged have been conclusively established, *manifestly it cannot decide as a matter of law or fact upon such a trial that any one of the substantive elements of the crime charged has been conclusively established.*" 188 P. at 475–76, quoting *State v. Holmes,* 68 Wash. 7, 122 P. 345 (1912). (Emphasis added.)

Similarly, in *Brooks v. United States,* 240 F.2d 905 (5th Cir. 1957) *cert. denied* 357 U.S. 927, 78 S.Ct. 1374, 2 L.Ed.2d 1372 (1958), the court held that the giving of the following instruction constituted reversible error:

"It was incumbent upon the Government to establish beyond a reasonable doubt that Naurbon L. Perry was a person authorized to administer oaths under the laws of the United States in connection with the investigation that he was conducting. *I charge you as a matter of law that Naurbon L. Perry was so authorized at the time he administered the oath to these individuals.*" 240 F.2d at 906.

The court held as follows:

"Appellants contend that the italicized portion of the charge was plain error. We agree for the all-sufficient reason that it deprived the jury of its function of determining whether or not, under the evidence and as exclusive judges of the facts *and of the credibility of the witness,* they believed beyond a reasonable doubt that Perry was an officer authorized to administer oaths in 1955 and thus violated appellant's constitutional right to a trial by jury as guaranteed by the Sixth Amendment. Heinous as the crime of perjury is under our law, it is entitled to no relaxation of the constitutional guaranty of the citizen in order to punish it." 240 F.2d at 906.

*See also People v. Grier,* 42 A.D.2d 803, 346 N.Y.S.2d 422 (1973).

Whether Aguilar was under oath at the time he made the alleged perjurious answer was a question of fact which the trial court improperly decided. We therefore should reverse and remand for a new trial.

## IV.

The second issue presented [6] is whether the trial court erred in allowing the jury to

---

**6.** I.C. § 1–205 provides that if this Court grants a new trial, "the court shall pass upon and

determine all the questions of law involved in the case presented upon such appeal, and nec-

hear parol testimony, as opposed to relying on a tape or transcript, to establish what transpired at the reciprocal action where the alleged false statement was made. Phrased generally, the question is whether proceedings in a court of record must be determined solely from that court's records.[7]

I.C. § 1–1103 provides that "[t]he ... reporter shall correctly report all oral proceedings had in said court and the testimony taken in all cases tried before said court ...." In *Ebersole v. State,* 91 Idaho 630, 428 P.2d 947 (1967), this Court held that the appellant was denied due process where there was no transcript of the arraignment proceedings, thus necessitating resort to parol evidence to establish what took place at those proceedings. In so holding, the Court, differently constituted one may be certain, stated the following:

> "The district court, a court of record, speaks through its records.... See also: *Herren v. People,* 147 Colo. 442, 363 P.2d 1044, 1046 (1961), wherein it is stated:
>
> > 'It has been said that the reason for the creation of courts of record is founded on the proposition that judicial records are not only necessary but indispensable to the administration of justice. The court hears arguments and decides upon its record; it acts by its record; its openings, sessions and adjournments can be proved only by its records; its judgments can be evidenced only by its records. The acts of a court of record are known by its records alone and cannot be established by parol testimony. The court speaks only through its records, and the judge speaks only through the court.'
>
> ....
>
> "Appellant herein, at the Ada County District Court habeas corpus proceedings, was faced with this dilemma: He was unable to secure a transcript by the court

reporter of what, in fact, transpired before the Jefferson County District Court. Nor was he able to secure court minutes prepared by the clerk of that court. All that he could do was rely upon his own testimony, *and be faced with the testimony of the district judge testifying from his own recollection of what transpired in court,* and the potential testimony of the prosecuting attorney who was in attendance at the Jefferson County proceedings (but who was not called as a witness at the habeas corpus hearing).

> "Appellant's dilemma was not of his own making.... It is not the failure of the established procedures that lead to appellant's dilemma; it was a failure to comply with the mandatory provisions of the statute.

> "When there is such a breakdown in the application of established procedures, as is reflected by this record, which necessitated resort to the parol evidence of court officials and of the appellant himself to establish what took place in a court of record, there is such a lack of fundamental fairness and deviation from established rules of procedure as to necessitate the conclusion that appellant has not been afforded the protection of the due process clauses of the Constitutions of the United States and this State." 91 Idaho at 634–36, 428 P.2d at 951–53 (emphasis added) (citations omitted).

Similarly, in *State v. Wright,* 97 Idaho 229, 542 P.2d 63 (1975), this Court stated that "[d]istrict courts, as courts of record, speak only through their records." *Id.* at 231, 542 P.2d at 65. And in *Farmer v. Loofbourrow,* 75 Idaho 88, 267 P.2d 113 (1954), this Court held as follows:

> "The oral consent allegedly made in open court to waive a jury trial was never entered in the minutes as required by Sec. 10–301, I.C.; respondent makes no

essary to the final determination of the case." Thus, this issue should be addressed. Since the question would be decided for purposes of guidance on remand, the majority's argument that no objection to the testimony was entered at trial would be irrelevant.

7. This is not a question under the so-called "best evidence" rule. No attempt is being made to prove the *contents* of the transcript; rather, the transcript is simply a recording of what took place.

contention otherwise but seeks to set up court minutes by the affidavit of his counsel; this cannot be done as district courts can speak only through their records. It follows that the affidavit will not be considered." 75 Idaho at 94, 267 P.2d at 116.

*See also State v. Sedam,* 62 Idaho 26, 34, 107 P.2d 1065, 1069 (1940); *Herren v. People,* 147 Colo. 442, 363 P.2d 1044 (1961).

There is no reason to depart from this general rule in the present case. The requirement that proceedings be recorded is mandatory, and it is self-evident that the most accurate method of determining what transpired in a courtroom is by consulting the transcript of the proceedings if reported stenographically, and the tape, if recorded electronically. Moreover, allowing parol testimony here, as observed in *Ebersole,* could well pit Aguilar's version of what transpired against that of the magistrate.[8] The better rule is simply to require that the proceedings in a court of record be determined from that court's records. That belief stands well fortified by the myriad of problems presented in this case, problems arising simply because the State was apparently unwilling to bring in the magistrate court recording and let the jury determine for itself whether Aguilar was properly sworn in the Oregon reciprocal action (which is for me to engage in the unwarranted assumptions for the moment that he had been properly charged and awarded his constitutional right to a preliminary hearing on a charge of committing perjury in that Oregon action).

It appearing that Aguilar was not given a preliminary hearing on the charge of committing perjury in the reciprocal action (from which it follows that the filing of the Second Amended Information was in error) thus leaving the court without jurisdiction to try him on that charge, the Court today should not only set aside the jury verdict, but direct that on remand the action be dismissed.

Other grounds for reversal, though not raised as issues on appeal, strongly fortify a reversal of the conviction. Throughout the perjury trial, counsel who then represented Aguilar constantly urged upon the trial the lack of materiality. The trial judge, however, let the issue go to the jury—having for himself ruled upon the oath issue and taken that from the jury—which is surely as fine of an example of juxtaposition as one might find.

Recently in *Nomer v. Kossman,* 100 Idaho 898, 606 P.2d 1002 (1980), the Court had occasion to become refamiliarized with URESA (Uniform Reciprocal Enforcement of Support Act). The Oregon action with which Aguilar was confronted could only have had for its purpose to place Aguilar under a court order for support of his child, and the usual and proper inquiry is into his ability to pay *so that an order may be entered and thereafter enforced* if he becomes delinquent. Under URESA a foreign state (Oregon), having an unsupported child (Aguilar's child), initiates a petition which is sent to the "responding state" (Idaho), and in such a manner the non-supporting father of the child (Aguilar) is subjected to a court order as aforesaid. Here, however, Aguilar was already under the court order which was placed against him as an ancillary part of the divorce action— and that was an Idaho court order, and in fact, the very one wherein minutes before Aguilar had been taken into custody under a thirty-day contempt commitment.

Without much doubt, in the Idaho proceeding—the divorce decree provision for child support—the question and the answer as to his cash on hand might have been material. But it is not readily seen that this would be so in the second proceeding being conducted for the State of Oregon. In the first place it should have been dismissed as redundant, and in the second

---

8. The prosecuting attorney representing the State at the Oregon reciprocal action is noted above as saying he could not remember whether the two cases were consolidated. As a practical matter, it is not readily understood how

the trial court could hold that there was a legal consolidation of the cases, or that the two were treated as one hearing. Both parties agree that at the conclusion of the first hearing there was a recess before the other hearing took place.

place it is extremely doubtful that the proceeding could go anywhere at all, as Aguilar could not be brought under *two* separate orders for child support.