# IN THE SUPREME COURT OF THE STATE OF IDAHO
## Docket No. 47482

STATE OF IDAHO, DEPARTMENT OF
FINANCE, SECURITIES BUREAU,

    Plaintiff-Respondent,

v.

SEAN ZARINEGAR,

    Defendant-Appellant,

And

PERFORMANCE REALTY
MANAGEMENT, LLC,

    Defendant

Boise, August 2020 Term

Filed: October 6, 2020

Melanie Gagnepain, Clerk

---

Appeal from the district court of the Fourth Judicial District of the State of Idaho, Ada County. Samuel A. Hoagland, District Judge

The ruling of the district court is <u>affirmed</u>. Costs and attorney fees on appeal <u>awarded</u> to the State of Idaho Department of Finance.

Sean Zarinegar, Phoenix, *pro se*, for Appellant.

State of Idaho, Department of Finance, Boise, attorneys for Respondent. Loren Messerly argued.

---

BEVAN, Justice

## I. NATURE OF THE CASE

This appeal arises from a civil enforcement action begun by the Idaho Department of Finance ("Department") against appellant, Sean Zarinegar, Performance Realty Management,

1

LLC ("PRM"), and other nominal defendants.[1] The complaint alleged Zarinegar and PRM committed securities fraud in violation of Idaho Code sections 30-14-501(2) and 30-14-501(4). The Department moved for summary judgment. Zarinegar and PRM responded with their own motion for partial summary judgment and a motion to strike several documents submitted by the Department in support of its motion for summary judgment. A few days before the district court was set to hear arguments on the motions, counsel for Zarinegar and PRM moved the district court for leave to withdraw as counsel of record. At the hearing, the district court preliminary denied the motion to withdraw, entertained the parties' arguments, and took all matters under advisement.

The district court later issued its memorandum decision and order denying, in part, Zarinegar's, and PRM's motions to strike. The district court also denied Zarinegar's and PRM's motion for partial summary judgment. The district court granted summary judgment for the Department after finding Zarinegar and PRM had misrepresented and omitted material facts in violation of section 30-14-501(2) and fraudulently diverted investor funds for personal use in violation of section 30-14-501(4). The district court then granted the motion to withdraw. The district court entered its final judgment against Zarinegar and PRM on September 30, 2019. Zarinegar, representing himself pro se, appealed the judgment. Zarinegar argues: (1) the district court lacked jurisdiction to enter judgment against him; (2) the district court violated his constitutional right to a jury trial and right to proceed pro se; (3) the district court's denial of Zarinegar's motions to strike as to certain documents was an abuse of discretion; and (4) the district court erroneously granted summary judgment for the Department. For the reasons discussed below, we affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

On July 5, 2007, the Alabama Securities Commission issued a Cease and Desist Order ("Alabama Order") against multiple respondents, including Zarinegar. The Alabama Order encompassed almost twenty pages of factual findings related to an investigation and audit of Malory Investments, LLC ("Malory"), a company which employed Zarinegar until 2005. The Alabama Order concluded that the respondents, including Zarinegar, committed multiple securities violations. Based on these findings, the Alabama Securities Commission ordered respondents,

---

[1] The complaint listed the following nominal defendants: 1) CBA Capital, Incorporated; 2) Premium Performance Group, LLC; 3) CORIX BIOSCIENCE, INCORPORATED; 4) KoriZ, LLC; and 5) Kori Kay Zarinegar. The nominal defendants were later dismissed by stipulation.

2

including Zarinegar, to immediately cease and desist from offering or selling securities into, within, or from Alabama.

The next day, the Kansas Securities Commission also issued a Cease and Desist Order ("Kansas Order") against multiple respondents, including Zarinegar. The Kansas Order, like the Alabama Order, included over twenty pages of factual findings related to an investigation and audit of Malory. The Kansas Order concluded that the respondents, including Zarinegar, violated multiple sections of the Kansas Securities Act. Relevant to the actions underlying this case, the Kansas Order found Zarinegar, in connection with the offer, sale or purchase of securities, had engaged in multiple misrepresentations. Based on these findings, the Kansas Securities Commission ordered the respondents, including Zarinegar, to immediately cease and desist from soliciting offers to buy or making offers to sell securities until certain requirements related to appropriate registration in Kansas were satisfied.

The Kansas Order provided that a respondent could contest the order by requesting a hearing, but Zarinegar waived his right to a hearing by signing a Stipulation for Consent Order, permitting the Kansas Securities Commission to issue a binding order against him. The Kansas Securities Commission then issued a Consent Order, ordering Zarinegar to cease and desist from "soliciting offers to buy or making offers to sell, or effectuating or transacting sales of securities, or the securities of any other person or issuer, or directly or indirectly aiding and assisting in the same or attempting to do the same" until certain requirements related to proper registration were satisfied.

Despite the Alabama Order, the Kansas Order, the Stipulation for Consent Order, and the Kansas Consent Order (collectively, "Orders"), Zarinegar continued selling securities. On October 21, 2009, Zarinegar organized PRM as a limited liability company in Arizona. PRM's Articles of Organization list Zarinegar as the sole manager of the company and vested all management of PRM in Zarinegar. On September 3, 2013, American Realty Partners, LLC, ("ARP") also organized as a limited liability company in Arizona. ARP's Articles of Organization list PRM as the sole manager of the company and vest all management of ARP in PRM.

3

In early 2014, Jack Combs, a managing partner of PRM, solicited Idaho resident James Rees with investment opportunities in ARP.[2] Combs introduced the investment to Rees through ARP's Private Placement Memorandum ("Memorandum").[3] The Memorandum provided: "[ARP] was formed . . . to (i) acquire, finance, own, refinance, maintain, improve, develop, construct, lease, manage, sell, exchange, or otherwise dispose of residential and/or commercial real property . . . and (ii) engage in such other activities as are reasonably incidental to the foregoing." ARP's Memorandum teems with statements related to operating ARP's business by acquiring, renovating, leasing, and managing residential real estate. Rees made his initial investment at that time.

About a year after Rees' initial investment, ARP converted to American Housing Income Trust, Incorporated ("AHIT"), through a Plan of Conversion and Stock Exchange Agreement approved by the Financial Industry Regulatory Authority.[4] The closing of the exchange agreement led ARP to become a wholly-owned subsidiary of AHIT with PRM continuing to act as its manager. All units of ARP were automatically exchanged for shares in AHIT. Following the conversion from ARP to AHIT, a letter was sent to Rees explaining that the conversion would allow ARP to "capture a larger piece of the ever-growing residential real estate market and to gain better recognition as a player in this competitive space." Moreover, publicly filed documents state AHIT continued "in the business of acquiring and operating residential properties" and retained ARP's intention of eventually operating as a Real Estate Investment Trust ("REIT").[5]

---

[2] The background information related to ARP is included to provide how Rees' investment in PRM came to be; however, the Department did not launch a civil enforcement action against ARP or its related offerings.

[3] A private placement is "[a] securities offering exempt from registration with the SEC . . . ." SEC, *Investor Bulletin: Private Placements Under Regulation D*, INVESTOR.GOV. (Sept. 24, 2014), https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins-31. "In practice, issuers often provide a document called a *private placement memorandum* . . . that introduces the investment and discloses information about the securities offering and the issuer." *Id*.

[4] The Securities Exchange Act of 1934 created the Securities and Exchange Commission. *The Laws that Govern the Securities Industry*, SEC.GOV, https://www.sec.gov/answers/about-lawsshtml.html#secact1933 (last modified Oct. 1, 2013). "The Act empowers the SEC with broad authority over all aspects of the securities industry." *Id*. Thus, the SEC is responsible for regulating self-regulatory organizations. *Id*. The Financial Industry Regulatory Authority ("FINRA") is a self-regulatory organization "authorized by Congress to protect America's investors by making sure the broker-dealer industry operates fairly and honestly." *About FINRA*, FINRA.ORG, https://www.finra.org/about (last visited Sept. 4, 2020).

[5] In general, a REIT is a corporation, association, or trust that is subject to and meets the requirements of section 856 of the Internal Revenue Code and is "managed by one or more trustees or directors," has "beneficial ownership of which is evidenced by transferable shares, or by transferable certificates of beneficial interest," which is generally "taxable as a domestic corporation," is not a financial institution or an insurance company and has the "beneficial ownership of which is held by 100 or more persons." *See* 26 U.S.C.A. § 856; *see also Civil Rights Educ. & Enf't Ctr.*

PRM's Memorandum, which PRM later provided to Rees, also provided several representations, disclaimers, and disclosures about the securities PRM offered. PRM's Memorandum provided that PRM's sole asset was 1,000,000 shares of common stock in AHIT. That said, the Memorandum explicitly stated in a footnote: "[a]lthough not made a part of any representation in connection with this Offering, background information related to the relationship between AHIT, [ARP] and [PRM] are detailed in AHIT's public disclosures at www.sec.gov/edgar. . . ."

As to the business activities of PRM, the Memorandum provided PRM was "devoted to real estate management, acquisition and investor relations for its related-entities, such as [ARP and AHIT]. . . ." PRM's Operating Agreement elaborated on that purpose:

> The business and purpose of [PRM] is to (i) manage, maintain, improve, develop, construct, lease, manage, sell, exchange, or otherwise dispose of residential and/or commercial real property for the benefit of third-parties, related or not, affiliated or not, regardless of location, either directly or indirectly through one or more subsidiary entities; (ii) engage in such other activities as are reasonably incidental to the forgoing; and (iii) engage in and do any act concerning any or all lawful businesses for which limited liability companies may be organized under Arizona law[.]

The Operating Agreement vested in Zarinegar, as the sole manager of PRM, the power to "direct, manage, and control the business of [PRM]" and granted "full and complete authority, power, and direction to make any and all decisions and to do any and all things that [Zarinegar] deem[ed] to be reasonably required to accomplish the business and objectives of [PRM]." Although granted with broad authority to manage PRM, Zarinegar, as manager, was required "[t]o hold and own any [PRM] real or personal properties in the name of [PRM]."

By May 2015, Rees' total investment in ARP amounted to $300,000. Through the conversion of ARP to AHIT, Rees' ARP units converted to 172,811 shares of common stock in AHIT. Rees continued to invest after the conversion and on November 25, 2015, Rees wire transferred $172,283.03 to PRM's Wells Fargo account ending in 1692. On December 16, 2015, unbeknownst to Rees, $175,000 was electronically transferred from PRM's account to Zarinegar's personal Wells Fargo account ending in 3345. The next day, December 17, 2015, the $175,000 was transferred from Zarinegar's Wells Fargo account to Zarinegar's Ameritrade account ending

_v. Hosp. Props. Tr._, 867 F.3d 1093, 1096 (9th Cir. 2017) ("REITs are vehicles for investors to own a fraction of a group of real estate holdings.").

in 0250. Zarinegar then made over five hundred debit card transactions from the Ameritrade account. By February 2016, Rees held 340,011 shares of common stock in AHIT, totaling an investment of $550,800.03.

On January 11, 2016, over a month after its initial presence in Idaho, PRM filed its Notice Filing for Regulation D Rule 505 ("Form D") with the Department. On January 19, 2016, almost two years after Rees' initial investment in ARP and a month after Rees' investment in PRM, AHIT filed its "Form S-11/A Registration Statement" ("Form S-11/A") with the SEC. In that filing, AHIT disclosed the Orders entered against Zarinegar in Alabama and Kansas.

In March 2017, AHIT purchased IX Biotechnology, Incorporated, a company focused on the production of certified organic cannabidiol oil (CBD). IX Biotechnology, Incorporated later changed its name to Corix Bioscience, Incorporated, ("Corix"). The goal of the purchase was to become the largest producer of CBD in the United States. As a result, Rees' 340,011 shares in AHIT were converted to 340,011 shares in Corix.

Procedurally, this case arose after PRM filed its Form D with the Department on January 11, 2016. Because of irregularities with the filing, the Department inquired into PRM. That inquiry eventually became an investigation. Based on its findings, the Department filed a complaint against Zarinegar, PRM, and the other nominal defendants pursuant to Idaho Code section 30-14-603. The complaint alleged Zarinegar, as manager of PRM, misrepresented and omitted material facts in connection with selling securities in violation of Idaho Code section 30-14-501(2). The complaint also alleged Zarinegar fraudulently diverted investor funds in violation of Idaho Code section 30-14-501(4). The complaint sought: (1) judgment confirming Zarinegar had violated the Idaho Uniform Securities Act ("IUSA"), as set forth in Idaho Code section 30-14-101 *et seq*.; (2) a permanent injunction to prohibit Zarinegar from engaging in the act of selling or offering securities in Idaho (3) restitution for Rees in the amount of $550,800.03; and (4) a civil fine of $20,000.

The Department moved for summary judgment. Zarinegar and PRM responded with a cross motion for partial-summary judgment on the alleged violation of section 30-14-501(2). In addition, Zarinegar and PRM moved to strike affidavits submitted by the Department in support of its motion for summary judgment. Shortly before all motions were set to be heard, counsel for Zarinegar and PRM filed a motion for leave to withdraw. At the hearing on the motions, the district court delayed ruling on counsel's motion for leave to withdraw, heard the parties' arguments, and took all matters under advisement. The district court issued its written decision and order on July

7, 2019, ruling: (1) denying in part and granting in part Zarinegar's motions to strike; (2) granting summary judgment for the Department; (3) denying Zarinegar's partial summary judgment motion; and (4) granting the motion for Zarinegar's counsel to withdraw.

After the district court issued its memorandum decision and order, Zarinegar, appearing pro se, continued to file numerous documents with the court. The Department moved the district court to enter judgment against Zarinegar and PRM. The district court heard the parties' arguments on September 30, 2019. It then entered judgment against Zarinegar and PRM, enjoining them from issuing, offering or selling securities in Idaho. The court also ordered Zarinegar and PRM to pay $550,800 to the Department on Rees' behalf, and imposed $20,000 in civil penalties upon Zarinegar and PRM. Zarinegar appealed.

### III. ISSUES ON APPEAL

**1.** Whether the district court had jurisdiction to enter judgment against Zarinegar?

**2.** Whether the district court violated Zarinegar's constitutional right to a jury trial or implied right to proceed pro se?

**3.** Whether the district court's denial of some of Zarinegar's motions to strike was an abuse of discretion?

**4.** Whether the district court's grant of summary judgment for the Department was erroneous?

### IV. STANDARD OF REVIEW

The standards of review directly relevant to each argument on appeal will be addressed below as pertinent to the analysis of those claims.

### V. ANALYSIS

Zarinegar asserts several errors on appeal. First, Zarinegar argues the district court did not have jurisdiction to enter judgment against him. Second, Zarinegar argues the district court violated his constitutional right to a jury trial and implied right to proceed pro se. Third, Zarinegar argues the district court abused its discretion when it failed to grant his motions to strike in their entireties. Last, Zarinegar argues the district court's grant of summary judgment for the Department was erroneous.

**A. The district court had jurisdiction to enter judgment against Zarinegar.**

The district court found Zarinegar violated the IUSA by misrepresenting and omitting material facts in connection with offering and selling securities and by fraudulently diverting investor funds for his own personal expenses. As a result, the district court entered judgment against Zarinegar. Zarinegar argues the district court lacked jurisdiction to enter judgment against

7

him. He maintains the district court lacked personal jurisdiction because he did not make any contact with Idaho nor did he waive personal jurisdiction. Zarinegar also argues the district court lacked subject matter jurisdiction because the proceeding below was criminal in nature and there was no filing of an information, indictment, or complaint, alleging an offense was committed in Idaho.

"The question of the existence of personal jurisdiction over an out-of-state defendant is one of law, which this Court reviews freely." *Dickinson Frozen Food, Inc. v. J.R. Simplot Co.*, 164 Idaho 669, 677, 434 P.3d 1275, 1283 (2019) (quoting *Knutsen v. Cloud*, 142 Idaho 148, 150, 124 P.3d 1024, 1026 (2005)). A party may assert as a defense that the district court lacks personal jurisdiction. *See* I.R.C.P. 12(b)(2). However, "[a] party waives any defense listed in subsection (b)(2) . . . by failing to assert it by motion before filing a responsive pleading or filing any other motion . . . ." *See* I.R.C.P. 12(h)(1). "The voluntary appearance of a party or service of any pleading by the party . . . constitutes a voluntary submission to the personal jurisdiction of the court." I.R.C.P. 4.1(a); *see also State v. Aguilar*, 103 Idaho 578, 580, 651 P.2d 512, 514 (1982) (holding a defendant consents to the court's personal jurisdiction when the defendant fails to "object or raise as an affirmative defense the asserted lack of personal jurisdiction over him as required under I.R.C.P. . . . 12(h), and participated in the proceeding.").

Zarinegar, through his attorneys of record, appeared and answered the allegations the Department made against him. The attorneys did not file a special appearance to contest jurisdiction under I.R.C.P. 4.1(b); thus, Zarinegar voluntarily submitted to the district court's personal jurisdiction. I.R.C.P. 4.1.(a). In addition, in his answer, Zarinegar listed ten affirmative defenses, but failed to assert that the district court lacked personal jurisdiction, as would be required to preserve the defense under I.R.C.P. 12(h)(1). Thus, Zarinegar waived the defense that the district court lacked personal jurisdiction.

Zarinegar also submitted to personal jurisdiction in Idaho through multiple filings he submitted on behalf of PRM. In December 2015, Zarinegar signed a Form D as "president" of PRM which was filed with the SEC. Form D specifies the issuer, by signing the form, appoints the security administrator of any state "in which th[e] notice is filed, as its agents for service of process, and agree[s] that these persons may accept service on its behalf, of any notice, process or pleading . . ." if an action arises from the sale of securities in that state. In addition, after the first sale of

PRM securities to Rees, PRM submitted its Form D with Idaho. Attached to the filing is Idaho's "Form U-2 Uniform Consent to Service of Process." That form specifies:

> [T]he undersigned does hereby consent that any such action or proceeding against it may be commenced in any court of competent jurisdiction and proper venue within the States so designated hereunder by service of process upon the officers so designated with the same effect as if the undersigned was organized or created under the laws of that State and have been served lawfully with process in that State.

Zarinegar signed the form as an executive officer of PRM and checked the director of Idaho's Department of Finance to be appointed as the designated officer as PRM's attorney in Idaho for receipt of service of process. For these reasons, we hold the district court had personal jurisdiction over Zarinegar.

As to subject matter jurisdiction, Zarinegar argues the district court lacked subject matter jurisdiction because the proceeding was criminal and an information or indictment was not filed against him. This Court also reviews freely whether the court had subject matter jurisdiction. *See Westover v. Idaho Cntys. Risk Mgmt. Program*, 164 Idaho 385, 388, 430 P.3d 1284, 1287 (2018) ("Jurisdictional issues, like [I.R.C.P. 12(b)(1) challenges] are questions of law, over which this Court exercises free review.").

"The district court shall have original jurisdiction in all cases, both at law and in equity." IDAHO CONST. art. V, § 20. "This Court has adopted a presumption that courts of general jurisdiction have subject matter jurisdiction unless a party can show otherwise." *Troupis v. Summer*, 148 Idaho 77, 80, 218 P.3d 1138, 1141 (2009).

> Jurisdiction over the subject matter is the right of the court to exercise judicial power over that class of cases; not the particular case before it, but rather the abstract power to try a case of the kind of character of the one pending; and not whether the particular case is one that presents a cause of action, or under the particular facts is triable before the court in which it is pending, because of some of the inherent facts that exist and may be developed during trial.

*Id.* at 79–80, 218 P.3d at 1140–41 (quoting *Richardson v. Ruddy*, 15 Idaho 488, 494–95, 98 P. 842, 844 (1908)). "Subject matter jurisdiction is a key requirement for the justiciability of a claim and cannot be waived . . . ." *Id.* at 79, 218 P.3d at 1140.

Here, based on its investigation into Zarinegar, the Department believed Zarinegar had misrepresented or omitted material facts in violation of Idaho Code section 30-14-501(2). The Department also believed Zarinegar diverted Rees' investor funds to his own personal use in

9

violation of Idaho Code section 30-14-501(4). The IUSA grants the Department authority to bring *civil* enforcement actions against any person who the Department believes violates securities law in Idaho. *See* I.C. § 30-14-603.

> If the administrator believes that a person has engaged, is engaging, or is about to engage in an act, practice, or course of business constituting a violation of [the IUSA] or that a person has, is, or is about to engage in an act, practice, or course of business that materially aids a violation of [the IUSA] . . . *the administrator may maintain an action in any court of competent jurisdiction to enjoin the act, practice, or course of business and to enforce compliance with [the IUSA].*

I.C. § 30-14-603(a) (emphasis added). The district court thus had subject matter jurisdiction over the proceedings brought by the Department against Zarinegar under Idaho Code section 30-14-603(a). Zarinegar's claim that the enforcement proceeding was a criminal matter because he was ordered to pay a civil penalty is baseless.

**B.      The district court did not violate Zarinegar's constitutional rights.**

The district court granted summary judgment for the Department; therefore, the case did not proceed to trial. As a result, Zarinegar argues the district court violated his constitutional right to a jury trial. According to Zarinegar, a jury trial is guaranteed whether the case is criminal or civil. In addition, the district court preliminarily denied Zarinegar's counsel's motion to withdraw. Zarinegar argues the district court's preliminary denial of counsel's motion to withdraw violated his constitutional "right to proceed pro se." We disagree with both of Zarinegar's contentions.

"[C]onstitutional questions . . . are questions of law over which this Court exercises free review." *Nye v. Katsilometes*, 165 Idaho 455, 458, 447 P.3d 903, 906 (2019) (quoting *Stuart v. State*, 149 Idaho 35, 40, 232 P.3d 813, 818 (2010)).

1. **A proper grant of summary judgment does not violate a non-moving party's right to a jury trial**.

In a single paragraph from his thirty-one page brief, Zarinegar argues the district court violated his right to a jury trial. There, Zarinegar simply restates the Idaho Constitution and asserts a defendant has a right to a trial by jury no matter if the case is criminal or civil. Zarinegar fails to support his argument with facts from the case below as to how he was denied this right. "Regardless of whether an issue is explicitly set forth in the party's brief as one of the issues on appeal, if the issue is only mentioned in passing and not supported by any cogent argument or authority, it cannot be considered by this Court." *Bach v. Bagley*, 148 Idaho 784, 790, 229 P.3d

1146, 1152 (2010). We hold Zarinegar's argument about his right to a jury trial was not sufficiently argued, which is a basis to dismiss this issue on appeal.

Even so, the district court did not deprive Zarinegar of his inviolate right to a jury trial. Zarinegar's bare assertion in his brief is merely an unsupported attack on the right to summary judgment under Idaho law. A properly granted summary judgment is not a violation to one's right to jury trial under the Idaho Constitution. *See McGimpsey v. D&L Ventures, Inc.*, 165 Idaho 205, 443 P.3d 219 (2019).

Our discussion in *McGimpsey* is instructive. There, explaining the intricacies between Idaho Rules of Civil Procedure 38, 39, and 56, this Court stated:

> Rules . . . 38 and 39 preserve a party's constitutional right to a jury trial and establish the procedures required to request [or] waive a jury trial. Meanwhile motions for summary judgment fall under Idaho Rule of Civil Procedure 56, and summary judgment must be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. To survive summary judgment, a non-moving party must demonstrate the existence of a genuine issue for trial. The burden shifts to the non-moving party to show the existence of a genuine issue of material fact. The adverse party must set forth specific facts—a mere scintilla of evidence, slight doubt, or conclusory assertions are insufficient to raise a genuine issue of material fact precluding summary judgment.

*McGimpsey*, 165 Idaho at 215, 443 P.3d at 229 (internal citations and quotations omitted). Ultimately, this Court held the district court's grant of summary judgment for D&L did not violate McGimpsey's right to a jury trial because the "district court addressed all of McGimpsey's claims in his complaint; there were no remaining issues for a jury trial to address." *Id*. at 216, 443 P.3d at 230.

Here, the Department filed a motion for summary judgment on all of Zarinegar's alleged violations of the IUSA. Zarinegar filed a cross motion for partial-summary judgment on the alleged violation of Idaho Code section 30-14-501(2). The district court heard the parties' summary judgment arguments, took the matters under advisement and issued its memorandum order and decision. The court found the Department had established Zarinegar engaged in securities violations in Idaho and that Zarinegar failed to raise any genuine dispute as to those violations. Thus, the district court granted summary judgment for the Department after finding there were no triable issues left to be decided by a jury and concluding the Department was entitled to summary

11

judgment as a matter of law. Such a ruling under I.R.C.P. 56 is well within the bounds of constitutionality.

**2.** **A party has no constitutional right to proceed pro se in a civil matter; to do so after being represented by counsel, the party must comply with the Idaho Rules of Civil Procedure.**

As to Zarinegar's argument regarding his implied right to proceed pro se, we hold the district court did not abuse its discretion in waiting to rule onZarinegar's counsel's motion to withdraw. In criminal prosecutions, the Sixth Amendment provides "the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. CONST. amend. VI; *see also* IDAHO CONST. art. I, § 13 ("In all criminal prosecutions, the party accused shall have the right to . . . appear and defend in person and with counsel."). "Implicit in this protection is also the 'right to proceed pro se when [the accused] voluntarily and intelligently elects to do so.' " *State v. Meyers*, 164 Idaho 620, 623, 434 P.3d 224, 227 (2019) (quoting *State v. Hoppe*, 139 Idaho 871, 874, 88 P.3d 690, 693 (2003)). Even so, the Sixth Amendment does not apply to civil proceedings. *See Ward v. State*, 166 Idaho 330, 333, 458 P.3d 199, 202 (2020) ("As civil proceedings, actions for post-conviction relief do not trigger the Sixth Amendment."). Thus, "a party to a civil action has no such Sixth Amendment right. Instead, a party to a civil action who wishes to proceed without an attorney must comply with the Idaho Rules of Civil Procedure." *Id.*

Idaho Rule of Civil Procedure 11.3 provides the specific route by which a party, once represented by counsel, may proceed without an attorney. *See Ward*, 166 Idaho at 333, 458 P.3d at 202. Relevant here, a party may proceed without counsel if the party's counsel withdraws under I.R.C.P. 11.3(b). *Id.*

> To withdraw from an action, except by substitution, an attorney must first obtain leave of the court. The attorney seeking to withdraw must file a motion with the court and set the matter for hearing, and must provide notice to all parties, including the party the withdrawing attorney represents in the proceeding. . . .
> I.R.C.P. 11.3(b)(1).

"By written order the court *may* grant leave to withdraw for good cause and upon such conditions or sanctions as will prevent delay or prejudice to the parties." I.R.C.P. 11.3(b)(2) (emphasis added). The process of withdrawal must follow the requirements of the Rule. *See Nunez v. Johnson*, 163 Idaho 692, 695, 417 P.3d 1018, 1021 (Ct. App. 2018) ("An attorney may withdraw from an action but only by strict compliance with the requirements of I.R.C.P. 11.3."). Because

the rule provides a court *may* grant leave to withdraw, withdrawal of an attorney is reviewed for an abuse of discretion. *See Idaho Workers Comp. Bd.*, 167 Idaho 13, 24, 467 P.3d 377, 388 (2020).

Thus, the Sixth Amendment right to counsel, and implied right to proceed pro se, does not apply here because this was a civil enforcement action. The issue is limited to whether the district court abused its discretion in waiting to rule on Zarinegar's counsel's motion to withdraw. On August 30, 2018, Joshua Leonard of Brian Webb Legal filed a notice of appearance stating he represented Zarinegar, PRM, and other nominal defendants in the proceedings. On May 14, 2019, seven days before the pretrial conference and the date for hearing the dispositive motions, counsel moved for leave to withdraw – listing a significant breakdown of the attorney-client relationship as the cause. At the pretrial conference, the district court summarily noted: "we're here on several motions. Plaintiff's motion for summary judgment, defendant's motion for Summary Judgment and defendant's Motion to Strike several different affidavits, plaintiff's motion to partially strike defendant's declaration and, finally, a motion by defense counsel for leave to withdraw as counsel of record." The district court entertained the parties' arguments on the motion to withdraw, as well as Zarinegar's own comments. The court then explained: "given that I have concerns about this defendant's mental capacity and competency to proceed in this matter, I'm not going to grant the motion without further psychiatric or psychological evaluation demonstrating to me that he's at least mentally competent to proceed." After further discussion about whether the court should proceed on the motions for summary judgment, the court stated:

> [U]ltimately it's my decision and it's a discretionary matter left with the court that I can use, but, again, I have questions as to [Zarinegar's] competency to proceed in this matter if I do let [counsel] out, and the State makes a good argument that this appears to be interposed to just obstruct and delay these proceedings.
>
> In other words, when you try to fire your lawyer on the eve essentially of a hearing that could ultimately dispose of all matters, that looks obstructionistic. But my major concern at this point in time is how this matter is going forward if I do let them out, and right now I'm inclined not to do that. Although, truth is, I walked in the door thinking that that was probably the easiest thing to do, but your responses have caused me great concern.
> . . . .
> I think that so long as we have competent counsel representing the defendants, I'm going to hear the summary judgment arguments today. I'm going to take the matter under advisement, and then I'll also take the motion for leave to withdraw under advisement.
> . . . .
> But seems like all the work has been done and I think it's best to hear it now while we have competent counsel who's able to do so. Recognizing, [Zarinegar's

13

counsel], I'm not ignorant of the fact this puts you into something of a difficult situation if your client wants to fire you, but the judge won't let you off. That puts you in a difficult position.

But once again, you have filed your counter motion and your various motions to strike. I think we ought to just get those heard while we're sitting here [at] the table.

Thus, finding substantial work had been completed by the attorneys of record, coupled with the court's reasonable concerns about Zarinegar's competency to represent himself on the motions before the court, the court exercised its discretion and delayed ruling on counsel's motion to withdraw. The district court also expressed its concerns about the potential delay[6] tactic involved in Zarinegar's eleventh-hour request to fire his attorney. Rule 11.3(b) plainly grants the court the discretion to consider such matters in deciding when and whether to allow an attorney to withdraw.

We find no abuse of discretion here. The district court's decision was grounded in the legitimate interests of expediency, avoiding delay, and protecting Zarinegar at a critical moment in the case. Such parameters undergird a trial court's discretion in making such decisions under I.R.C.P. 11.3(b)(1). Even more, the court ultimately granted the motion for leave to withdraw. Any prejudice that Zarinegar might now claim was cured by the district court's ultimate granting of Zarinegar's counsel's motion for leave to withdraw, permitting Zarinegar the right to proceed in the litigation, pro se.

C.    **The district court's partial denial of Zarinegar's motions to strike was not an abuse of discretion.**

Zarinegar moved to strike several documents submitted by the Department in support of its motions for summary judgment. Relevant to this appeal, Zarinegar moved to strike Exhibits I through M, (all the Orders and a Notice of Hearing issued by the Illinois Securities Commission),[7] as well as Exhibits N through BB, (the financial records of Zarinegar and PRM). Zarinegar argued the exhibits lacked foundation and contained inadmissible hearsay. The district court denied Zarinegar's motion to strike Exhibits I through L finding they were admissible under the public records exception to the hearsay rule. I.R.E. 803(8). The court also denied Zarinegar's motion to

---

[6] Had the district court immediately granted counsel's motion to withdraw, Zarinegar would have been the recipient of an automatic stay of no less than twenty-one days as required by I.R.C.P. 11.3(c)(2).

[7] The Department voluntarily withdrew Exhibit M, the Illinois Notice of Hearing.

strike Exhibits N through BB finding they were admissible under the business records exception to the hearsay rule. I.R.E. 803(6).

On appeal, Zarinegar argues the district court abused its discretion by denying his motion to strike the Orders and the financial records. Zarinegar argues the district court erroneously took judicial notice of the Orders. Zarinegar also argues the Orders were untrue, rendering them void, and inadmissible because "he never received any notice or he would have replied." Finally, Zarinegar argues the business record exception does not apply to the financial records.

The "trial court has the discretion to decide whether an affidavit offered in support of or opposition to a motion for summary judgment is admissible under Rule 56[(c)(4)]." *Est. of Ekic v. Geico Indem. Co.*, 163 Idaho 895, 898, 422 P.3d 1101, 1104 (2018). Thus, "[t]his Court reviews challenges to a trial court's evidentiary rulings under the abuse of discretion standard." *Perry v. Magic Valley Reg'l Med. Ctr.*, 134 Idaho 46, 50, 995 P.2d 816, 820 (2000). When this Court reviews an alleged abuse of discretion, it asks whether the trial court "(1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason." *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018).

Idaho Rule of Civil Procedure 56 governs the admissibility of supporting and opposing affidavits on motions for summary judgment. Rule 56(c)(4) provides:

> An affidavit used to support or oppose a motion must be made on personal knowledge, *set out facts that would be admissible in evidence*, and show that the affiant or declarant is competent to testify on the matters stated. Sworn or certified copies of all papers or parts of papers referred to in an affidavit must be attached to or served with the affidavit. The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits.

(Emphasis added). The requirements set forth in I.R.C.P. 56(c)(4) "are not satisfied by an affidavit that is conclusory, based on hearsay, and not supported by personal knowledge." *Portfolio Recovery Assocs., LLC v. MacDonald*, 162 Idaho 228, 231, 395 P.3d 1261, 1264 (2017).

### 1. The Orders.

"This Court will not consider issues raised for the first time on appeal." *State v. Garcia-Rodriguez*, 162 Idaho 271, 275, 396 P.3d 700, 704 (2017) (quoting *Mickelsen Const., Inc. v. Horrocks*, 154 Idaho 396, 405, 299 P.3d 203, 212 (2013)). "[A]ppellate court review is limited to

the evidence, theories and arguments that were presented below." *Id*. (quoting *Nelson v. Nelson*, 144 Idaho 710, 714, 170 P.3d 375, 379 (2007)).

Zarinegar argues in his briefing that the district court's analysis of the Orders was erroneous because "what the court did was attempt to take judicial notice of those [O]rders." Zarinegar also argues the Orders are untrue and he was not provided adequate notice of them. A review of the record quickly dispels Zarinegar's arguments on the Orders because at no time below did the district court take judicial notice of the Orders, nor did Zarinegar argue the Orders were untrue or that he had no notice of them. Instead, Zarinegar argued the Orders were inadmissible because they lacked foundation and did not satisfy the public records exception to the rule against hearsay. The district court was unpersuaded and found the Orders were admissible because they were self-authenticating and satisfied the public records exception. I.R.E. 803(8). Thus, we decline to consider Zarinegar's appellate argument as to the Orders because the issues raised on appeal are not based on the same theories raised below. *See Garcia-Rodriguez*, 162 Idaho at 275, 396 P.3d at 704.

In any event, the Orders are admissible under the public records exception to the rule against hearsay. The "Idaho Rules of Evidence allow for the admission of public records as an exception to the hearsay rule." *Navarro v. Yonkers*, 144 Idaho 882, 886, 173 P.3d 1141, 1145 (2007) (citing I.R.E. 803(8)). I.R.E. 803(8) provides a statement is of public record if:

(A) it sets out:
> i. the office's regularly recorded and regularly conducted activities; or
> ii. a matter observed while under a legal duty to report, or factual findings resulting from an investigation conducted under legal authority, but not included:
>> (a) a statement or factual finding offered by the public office in a case in which it is a party; or
>> (b) an investigative report by law enforcement personnel or a public office's factual finding resulting from a special investigation of a particular complaint, case, or incident, except when offered by an accused in a criminal case; and

(B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.

Public records that bear a state seal and are signed are self-authenticating. I.R.E. 902(1). Additionally, certified copies of public records are self-authenticating. I.R.E. 902(4). Thus, these records "require no extrinsic evidence of authenticity in order to be admitted." I.R.E. 902.

Exhibit I, the Alabama Order, bears the state seal of Alabama. In addition, Exhibit I is signed by the director of the Alabama Securities Commission. Thus, Exhibit I is self-authenticating under I.R.E. 902(1).

Exhibit J, the Kansas Order, bears the state seal of Kansas. In addition, a commissioner of the Kansas Securities Commission signed Exhibit J. The Department also provided a certified copy of the Kansas Cease and Desist Order later. Thus, Exhibit J is self-authenticating under I.R.E. 902(1) and 902(4).

Exhibit K, the Kansas Stipulation for Consent Order, does not include the Kansas state seal. However, the Department later provided a certified copy of the stipulation that both Zarinegar and an officer with the Kansas Securities Commission signed. Thus, Exhibit K is self-authenticating under I.R.E. 902(4).

Exhibit L, the Kansas Consent Order, bears the state seal of Kansas. In addition, a commissioner with the Kansas Securities Commission signed Exhibit L. The Department later provided a certified copy of the Kansas Consent Order as well. Thus, Exhibit L is self-authenticating under I.R.E. 902(1) and 902(4).

Last, the Orders set forth factual findings resulting from an investigation conducted under legal authority. Zarinegar failed to show that the source of information revealed a lack of trustworthiness aside from his conclusory statements that the Orders were untrue. His claim of lack of notice is also unsupported by the record. Thus, the district court did not abuse its discretion by admitting the Orders under the public records exception to the rule against hearsay.

## 2. **The financial statements of Zarinegar and PRM.**

"This Court will not search the record for error. We do not presume error on appeal; the party alleging error has the burden of showing it in the record." *Garcia-Rodriguez*, 162 Idaho at 276, 396 P.3d at 705 (quoting *Miller v. Callear*, 140 Idaho 213, 218, 91 P.3d 1117, 1122 (2004)). Therefore, this Court will not consider issues unsupported by argument and authority in a party's opening brief. *See AgStar Fin. Servs., ACA v. Nw. Sand & Gravel, Inc.*, 161 Idaho 801, 815, 391 P.3d 1271, 1285 (2017). "Regardless of whether an issue is explicitly set forth in the party's brief as one of the issues on appeal, if the issue is only mentioned in passing and not supported by any cogent argument or authority, it cannot be considered by this Court." *Bach v. Bagley*, 148 Idaho 784, 790, 229 P3d 1146, 1152 (2010). "A party waives an issue cited on appeal if either authority

17

or argument is lacking, not just if both are lacking." *AgStar Fin. Servs.,* 161 Idaho at 816, 391 P.3d at 1286.

The three pages of Zarinegar's brief dedicated to the district court's denial of his motion to strike the financial records submitted by the Department are supported by legal authority. However, that authority is unsupported by citations to the record demonstrating how the district court erred below. Zarinegar argues the district court abused its discretion by admitting his financial records and the financial records of PRM because "there is an inadequate foundation for the information provided." Zarinegar then argues:

> There is nothing to indicate any knowledge of the accuracy and reliability of the computer system, how the information gets into the computer, and how the purported certifying witness would have any idea if the information was correct.
> Not only is the affidavit insufficient as a business record, but the affidavit itself is hearsay and should be deemed inadmissible. The affidavit merely describes what certain records allegedly reflect about the information of Mr. MacDonald, without attaching copies of the actual records from his account. This is the epitome of hearsay.

We are unsure where this block quote came from, but it has nothing to do with this case. There is no Mr. MacDonald here, nor was any affidavit of Mr. MacDonald ever filed in this case. The argument is specific to a single affidavit "signed on April 7, 2014," despite fifteen documents and over two hundred pages being admitted containing financial records of Zarinegar and PRM. There is no affidavit in the record signed on April 7, 2014. The record does include a letter dated April 7, 2014, from Combs, managing partner of PRM. Still, that letter was not the subject of Zarinegar's motion to strike below, nor is it related to financial records of Zarinegar or PRM. Zarinegar's argument regarding the financial records is, at best, a recitation of applicable law with no attempt to apply that law to the facts here.

Notwithstanding the shortcomings noted above, we understand the essence of Zarinegar's arguments on appeal and decline to dismiss this argument for lack of argument or authority. Nevertheless, we affirm the district court's admission of the financial statements under the business records exception to the rule against hearsay.

Idaho Rule of Evidence 803(6) provides in relevant part:

The following are not excluded by the rule against hearsay, regardless of whether the declarant is available as a witness:
. . .
**(6) Records of a Regularly Conducted Activity**. A record of an act, event, condition, opinion, diagnosis if:

18

(A) the record was made at or near the time by—or from information transmitted by—someone with knowledge;

(B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

(C) making the record was a regular practice of that activity;

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12); and

(E) the opponent does not show that the source of information of the method or circumstances of preparation indicate a lack of trustworthiness.

"[T]he general requirement for admission under I.R.E. 803(6) is that the document be 'produced in the ordinary course of business, at or near the time of occurrence and not in anticipation of trial.'" *State v. Cunningham*, 164 Idaho 759, 764, 435 P.3d 539, 544 (2019) (quoting *Portfolio Recovery Assocs.,* 162 Idaho at 233, 395 P.3d at 1266). "These foundational requirements 'supply the degree of trustworthiness necessary to justify an exception to the rule against hearsay.'" *Id.* (quoting *Hurtado v. Land O'Lakes, Inc.*, 147 Idaho 813, 815, 215 P.3d 533, 535 (2009)). A business record can be in any format including statements based on electronic information. *See Portfolio Recovery Assocs.*, 162 Idaho at 233, 395 P.3d at 1266.

Moreover, under the Idaho Rules of Evidence, records of a regularly conducted business activity are self-authenticating if

[t]he original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C) [the business record exception], as shown by a certification of the custodian or another qualified person. As used in this subsection, "certification" means a written declaration signed in a matter that, if falsely made, would subject the maker to a criminal penalty in the jurisdiction where the certification is signed.
. . .

I.R.E. 902(11).

Exhibits N through Z contain the financial records of Zarinegar and PRM obtained from Wells Fargo Bank. To adhere to the requirements of I.R.E. 902(11), the Department submitted a "Business Records Declaration" of Krista Yu, an employee of Wells Fargo. Yu's declaration provided that she was a "duly authorized and qualified witness to certify the authenticity" of the Wells Fargo financial records. The records "[w]ere prepared . . . in the ordinary course of business at or near the time of the acts . . . described in the records" and "[i]t was in the ordinary course of business for [Yu] . . . with knowledge of the act . . . to make the record or transmit the information therein to be included in such record." The declaration was also signed by Yu under penalty of perjury under the laws of Idaho. Zarinegar also failed to show that the documents' method or

19

circumstances of preparation were untrustworthy aside from conclusory statements attacking the computer system that generated the financial records. Thus, the exhibits containing financial records obtained from Wells Fargo were self-authenticating under I.R.E. 902(11). Adequate foundation was provided. The records were properly found admissible under I.R.E. 803(6).

Exhibits AA and BB contain the financial records of Zarinegar obtained from Ameritrade. After Zarinegar moved to strike the exhibits, the Department provided a supplemental affidavit to cure any deficiencies raised. *See* I.R.C.P. 56(c)(4) ("The court may permit affidavits to be supplemented . . . ."). The supplemental affidavit included the "Declaration of Patrick J. Rowley Certifying Records of Regularly Conducted Business Activity." Under penalty of perjury, Rowley, an employee of Ameritrade who was authorized and qualified to make the declaration, explained:

> I further certify that the documents provided on February 10, 2017, identified under TDA#123815 are true copies of records that were:
> (a) made at or near the time of the occurrence of the matters set forth therein, by, or from information transmitted by, a person with knowledge of those matters;
> (b) kept in the course of regularly conducted business activity; and
> (c) made by the regularly conducted business activity as a regular practice.

Again, Zarinegar failed to show that the records' method or circumstances of preparation were untrustworthy. Thus, the exhibits containing financial records obtained from Ameritrade were self-authenticating under I.R.E. 902(11) and admissible under I.R.E. 803(6). For these reasons, we hold the district court did not abuse its discretion in denying Zarinegar's motions to strike as to these documents.

**D.      The district court did not err in granting summary judgment to the Department.**

The district court granted summary judgment for the Department after finding Zarinegar violated Idaho Code sections 30-14-501(2) and 30-14-501(4). Zarinegar maintains there was no violation of Idaho Code section 30-14-501(2) because Rees knew of the Alabama and Kansas Orders through AHIT's public filings. Zarinegar also argues no misrepresentations were made to Rees regarding transfer of investment funds to Zarinegar's personal accounts or conversion of the real estate investment to an investment in a cannabis operation. Zarinegar maintains PRM's materials gave Zarinegar, as manager, wide discretion in conducting the activities of the business. Lastly, Zarinegar argues there was no evidence that he diverted investor money for his own personal expenses in violation of Idaho Code section 3-14-501(4).

20

This Court "uses the same standard properly employed by the district court originally ruling on the motion" when reviewing a district court's grant of summary judgment. *Ciccarello v. Davies*, 166 Idaho 153, 158, 456 P.3d 519, 524 (2019) (quoting *Lanham v. Fleenor*, 164 Idaho 355, 358, 429 P.3d 1231, 1234 (2018)).

> The court must grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. All disputed facts are to be construed liberally in favor of the non-moving party, and all reasonable inferences that can be drawn from the record are to be drawn in favor of the non-moving party. In order to survive a motion for summary judgment, the non-moving party must make a showing sufficient to establish the existence of an element essential to that party's case on which that party will bear the burden of proof at trial.

*Id*. at 128–29, 456 P.3d at 524–25 (internal citations and quotations omitted).

### 1. <u>Zarinegar failed to genuinely dispute that he omitted and misrepresented material facts in violation of Idaho Code section 30-14-501(2).</u>

The district court found the Department satisfied its burden in showing Zarinegar committed multiple instances of securities fraud under Idaho Code section 30-14-501(2). The district court reviewed Zarinegar's supporting evidence to determine whether he could "establish the existence of a genuine issue of material fact that he did not commit securities fraud, i.e., that he did not make any untrue statements of material fact, omit any material facts in connection with the offerings and sales of [PRM] securities . . . ." *State v. Shama Res. Ltd. P'ship*, 127 Idaho 267, 273, 899 P.2d 977, 983 (1995). Ultimately, the district court found no genuine issue of material fact that "[Zarinegar] violated Idaho Code [section] 30-14-501(2) by failing to disclose the [Orders], omitting or misrepresenting that the investment funds could be transferred from PRM to Zarinegar, and omitting or misrepresenting that the real estate investment could be transferred to a cannabis enterprise."

The IUSA prohibits fraud. *See* I.C. § 30-14-501. Section 30-14-501(2) provides it is unlawful for a person in connection with the offer or sale of a security to "make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading[.]" The burden of proof thus requires two elements: (1) the person made an untrue statement or omitted a fact; and (2) such statement or omission was material.

"The question of materiality, it is universally agreed, is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor." *TSC Indus., Inc. v.*

21

*Northway, Inc.*, 426 U.S. 438, 445 (1976). "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Id.* at 449. This standard focuses on whether the fact "would have assumed actual significance in the deliberations of the reasonable shareholder" or, in other words, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' or information made available." *Id.* "[I]ntent is not an element of securities fraud. . . ." *Shama*, 127 Idaho at 272, 899 P.2d at 982.

> a. *Zarinegar failed to establish an issue of material fact that the Orders were not material and that he omitted the Orders in violation of Idaho Code section 30-14-501(2).*

On appeal, Zarinegar argues that he did not omit material facts in that he disclosed the Orders in AHIT's Form S-11/A. He also contends that Rees, who at the time he subscribed to PRM was already a shareholder in AHIT, had notice of the Orders included in the Form S-11/A and other publicly filed documents. Zarinegar also contends that these omissions, if any, were not material.

Addressing materiality first, Zarinegar's inclusion of the Orders in AHIT's Form S-11/A is a key admission that Zarinegar knew the Orders were material. Other jurisdictions have held that the omission of administrative orders from a Memorandum by someone selling securities is material as a matter of law. *See SEC v. Merch. Cap., LLC*, 483 F.3d 747, 771 (11th Cir. 2007) ("The existence of a state cease and desist order against identical instruments is clearly relevant to a reasonable investor, who is naturally interested in whether management is following the law in marketing the securities."); *United States v. Bessesen*, 433 F.2d 861, 864 (8th Cir. 1970) (holding a defendant concealed a material fact by failing to disclose the existence of a cease and desist order); *S.E.C. v. Levine*, 671 F. Supp. 2d 14, 27–28 (D. D.C. 2009) ("It cannot be disputed that a reasonable investor would want to know whether the person they are sending their money to in order to purchase a stock has been previously found to have violated the securities law."). We adopt this rationale and hold that Zarinegar's omission of the Orders was material as a matter of law.

As to Zarinegar's omission of the Orders in PRM's Memorandum, the footnote in the Memorandum is an insufficient disclosure. It is undisputed that PRM's Memorandum made no disclosure of the Orders. The closest the Memorandum came to disclosing the Orders was a footnote providing:

Although not made a part of any representation in connection with this Offering, background information related to the relationship between AHIT, [ARP] and [PRM] are detailed in AHIT's public disclosures at www.secqov/edgar. Furthermore, audited financials outlining the value of the 1,000,000 shares of AHIT stock owned by [PRM] are set forth therein.

Not only does PRM's Memorandum fail to disclose the Orders, the Memorandum explicitly disclaims the relevancy of AHIT's publicly filed documents to PRM's securities offering. Essentially, Zarinegar failed to disclose the Orders in PRM's Memorandum and then blamed Rees for failing to discover the Orders on his own. Such an argument violates the policy underpinning the IUSA. The maxim of *caveat emptor* is inapplicable in these cases. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 234 (1988) ("We have recognized time and again, a 'fundamental purpose' of the various Securities Acts, 'was to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry.' "). For these reasons, we hold the district court correctly ruled the Orders were material and that Zarinegar failed to disclose the Orders in violation of Idaho Code section 30-14-501(2).

> b.       *Zarinegar failed to raise a genuine issue of material fact that supported his personal use of PRM's funds.*

Information related to how an investor's property is held with a company is material. *See SEC v. Riel*, 282 F. Supp. 3d 499, 520 (D. N.D.N.Y. 2017) ("No reasonable investor would have invested . . . had he or she known . . . [the defendant] would use most of the investment funds for personal expenses."). Thus, omission of information about the transfer of investor funds from PRM's account to Zarinegar's personal accounts is material.

As to the failure to disclose such information, Zarinegar relies on the authority granted to him as manager to transfer funds. He maintains these powers were adequately disclosed through PRM's Memorandum. But these powers explicitly required that Zarinegar, as manager, was to "hold and own any [PRM] real or personal properties *in the name of the [PRM]*." It is undisputed that Zarinegar transferred $175,000 of investor funds from PRM's account to Zarinegar's personal accounts, some of which included the $172,283 Rees had invested. Thus, some of the property, which was to be held at all times in the name of PRM, was not held as required. Therefore, the district court did not err in granting summary judgment for the Department because Zarinegar failed to genuinely dispute that he violated Idaho Code section 30-14-501(2) by misrepresenting that all investment funds of Rees would always be held in PRM's name.

23

> c. *Zarinegar failed to dispute the fact that the investment in real estate could be converted to an investment in a cannabis operation was material and that Zarinegar misrepresented such information in violation of Idaho Code section 30-14-501(2).*

Misrepresentations regarding the use of investors' funds are material. *See SEC v. Research Automation Corp.*, 585 F.2d 31, 35 (2d Cir. 1978) (explaining that an appellant's misleading statements were material because "[w]hat reasonable investor would not wish to know that the money raised by stock sales would not be used for working capital but be diverted to [a company's] officers?"); *see also SEC v. Lottonet Operating Corp.*, No. 17-21033-CIV, 2017 WL 6949289, at *1, *13 (D. S.D. Fla. Mar. 31, 2017) (stating misrepresentations regarding the use of investor funds are material, citing numerous cases in support and ultimately holding that "[a]ny reasonable investor would want to know how [d]efendants were really using investor funds . . . .").

As to whether that information was disclosed, Zarinegar again relies on the powers vested in management to make any and all decisions related to the business activities of PRM provided in PRM's Memorandum. That disclosure provides:

> The Manager shall direct, manage, and control the business of [PRM] to the best of its ability and shall have full and complete authority, power, and discretion to make any and all decisions and to do any and all things that the Manager deems to be reasonably required to accomplish the business and objectives of [PRM] in performing its duties under this Agreement.

But the materials provided to Rees all explained ARP and PRM's business was in real estate investments. ARP's Memorandum provides that ARP's operation of business was to acquire, renovate, lease, and manage single-family residential properties. Similarly, PRM's Memorandum stated that the investments were solely for real estate investments. As PRM's operating agreement provides, "[t]he business and purpose of [PRM] is to (i) manage, maintain, improve, develop, construct, lease, manage, sell, exchange, or otherwise dispose of residential and/or commercial real property . . . . [and] (ii) engage in such other activities as are reasonably incidental to the forgoing[.]" Thus, what was disclosed to Rees about how his investment was to be used was that all investment funds were to be contributed toward acquiring real estate and the incidental costs associated with maintaining real estate investments. The materials provided by ARP and PRM require that even if management could convert investor funds in its own discretion, management was still required to do so in a way that furthered the objectives of the business, which, through its materials, was and had always been, real estate investments. Thus, the district court did not err in

24

granting summary judgment for the Department because Zarinegar failed to genuinely dispute that he violated Idaho Code section 30-14-501(2) by misrepresenting that Rees' investment in real estate could be converted to an investment in a cannabis operation.

**2.** **The district court's grant of summary judgment for the Department on Idaho Code section 30-14-501(4) was not erroneous because Zarinegar failed to genuinely dispute that he diverted investor money for his own personal use.**

The district court found it undisputed that Zarinegar transferred Rees' investment money from PRM's business account to Zarinegar's personal bank account. The district court also found Zarinegar used some of that money for personal expenses like haircuts, pest services, and car washes. Thus, the district court held there was no genuine dispute of material fact that Zarinegar diverted investor money for his own personal use in violation of Idaho Code section 30-14-501(4). Zarinegar, relying on the common law claim of conversion, argues the district court erred because he did not obtain the funds wrongfully and Rees did not own or possess the property at the time of the purported conversion. Zarinegar also argues no evidence exists that funds were used on personal expenses.

Idaho Code section 30-14-501(4) provides it is unlawful for a person in connection with the offer or sale of securities "[t]o divert investor money to the personal use of the issuer, offeror or seller . . . without specifically disclosing that use before receiving the investor's money." "[I]t is sufficient that the person engage in those enumerated activities, in connection with the offer, sale, or purchase of a security, to commit securities fraud under the relevant portions of the Idaho Securities Act." *Shama*, 127 Idaho at 272, 899 P.2d at 982.

First, Rees testified he was not told that his investment could be used for the personal expenses of PRM's management. In addition, PRM's operating agreement provided that all company property, i.e., investment funds, was to be kept in the name of PRM and not in the name of any manager. Despite this provision, Zarinegar transferred $175,000 of funds from PRM's business account to his personal Wells Fargo account on December 16, 2015, some of which included Rees' investment of $172,283. The $175,000 was then transferred to Zarinegar's personal Ameritrade account. Before that transfer, the Ameritrade account held only $759.52. The Ameritrade statements disclose multiple purchases totaling around $60,000 for activities related to the personal expenses of Zarinegar including, but not limited to, haircuts, carwashes, and food expenditures. Thus, the district court did not err in finding Zarinegar failed to genuinely dispute

25

that he diverted investor money for his personal use without specifically disclosing that use before receiving Rees' investment money in violation of Idaho Code section 30-14-501(4).

## VI. SANCTIONS

Idaho Appellate Rule 11.2 requires "[a] party who is not represented by an attorney [to] sign the . . . brief [submitted to this Court] and state the party's address." I.A.R. 11.2(a).

> The signature of an attorney or party constitutes a certificate that the attorney or party has read the notice of appeal, petition, motion, brief or other document; that to the best of the signer's knowledge, information, and belief after reasonable inquiry it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

*Id.* This Court, on its own initiative, "shall impose upon the person who signed [a brief] . . . an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the . . . brief . . . including a reasonable attorney's fee" where this Court finds a brief is signed in violation of I.A.R. 11.2. *Id.* "[A]ttorney fees can be awarded as sanctions when a party or attorney violates either (a) the frivolous filings clause or (b) the improper purpose clause." *Hartgrave v. City of Twin Falls*, 163 Idaho 347, 357, 413 P.3d 747, 757 (2018).

This Court has "previously interpreted the frivolous filings clause to apply under the same circumstances that warrant awards under Idaho Code section 12-121." *Bergeman v. Select Portfolio Serv.*, 164 Idaho 498, 503, 432 P.3d 47, 52 (2018). Courts "may award reasonable attorney's fees to the prevailing party or parties when the judge finds that the case was brought, pursued or defended frivolously, unreasonably or without foundation." I.C. § 12-121. Briefs unsupported by legal authority or citation to the record have been considered frivolous by this Court. *See Haight v. Idaho Dep't of Transp.*, 163 Idaho 383, 393, 414 P.3d 205, 215 (2018) (holding an appeal was frivolous because appellant's claims "contain[ed] little in the way of legal argument of authority."); *see also Sprinkler Irrigation Co., Inc. v. John Deere Ins. Co., Inc.*, 139 Idaho 691, 698, 85 P.3d 667, 674 (2004) (holding sanctions were proper when attorney's brief was "virtually void of any citation to the transcript and record relied upon" and thus "failed to conduct a reasonable inquiry that the appeal be well grounded in fact and warranted by existing law as required" by the appellate rules).

Although we proceed with the imposition of sanctions guardedly, we find sanctions warranted here. Zarinegar submitted briefing to this Court that was significantly astray of the arguments made below and lacked any meaningful reference to the record. Thus, we order Zarinegar to pay to the Department the amount of the reasonable expenses incurred in responding to the frivolous filing of Zarinegar's appellate brief. *See* I.A.R. 11.2(a).

## VII. CONCLUSION

For these reasons, we affirm the district court.

Chief Justice BURDICK, Justices BRODY, STEGNER and MOELLER, CONCUR.